## MAMMOTH CITY v. SNOW et al.

No. 4368.   Decided December 22, 1926.   (253 P. 680.)

206

*J. W. Robinson,* of Provo, for plaintiff.

*Harvey H. Cluff,* Atty. Gen., for defendants.

*Cheney, Jensen, Martineau & Stephens* and *R. G. Lucas,* all of Salt Lake City, amicus curiæ.

STRAUP, J.

The plaintiff, Mammoth City, December 24, 1925, presented an affidavit or petition to this court wherein it is alleged that the Chief Consolidated Mining Company, a corporation, and the Grand Central Mining Company, a corporation, during the years of 1923 and 1924, were the owners and in possession of "mines and mining claims," giving the names of about 20 claims, situate in Mammoth City, Juab county, Utah, from which both of such companies during such years made large extractions of ore, the net proceeds of which amounted approximately to $1,500,000; that it was the duty of such companies to make out and file with the state board of equalization and assessment a report showing the gross and net proceeds derived by them from ores extracted during such years from such mines and claims, but failed to do so, and it thus became the duty of the board to ascertain such proceeds for taxing purposes from the best information obtainable, but it also failed to do so, and thus no assessment was had for the years in question of net proceeds from such mines and claims; that it was the duty of the board, prior to the first Monday in May of

the years 1924 and 1925, to assess all mines, mining claims, and mining properties within the state, and, before the third Monday in June, "apportion the total of such assessments . . to the several counties in which the mines, mining claims, and mining properties were located"; that during the year 1924 Mammoth City caused a levy to be made upon all of the taxable property within its corporate limits, including the aforementioned mines and mining claims, of 15 mills on the $1 of assessed valuation, but because of the failure of the companies and the board to make the assessment as the law provides, the city was deprived of taxes upon such properties situated within its corporate limits, which taxes the plaintiff approximated to be $22,500. Thus Mammoth City prayed for a writ of mandate directing the board to assess such mines and mining claims in accordance with chapter 114, Laws Utah 1919, or show cause why it should not do so.

Such an alternative writ was issued. In response thereto the board answered admitting that the mines and mining claims mentioned in the affidavit or petition of the plaintiff were located within the corporate limits of the city, but denying that the Grand Central Mining Company, since November, 1922, owned any part of such mines, and, to the contrary, alleged that at that time the Grand Central Mining Company sold and conveyed all of such claims to the Chief Consolidated Mining Company, who then became, and during the years 1923 and 1924 was, the sole owner of them; that upon such conveyance such claims were consolidated with other mining claims owned by the Chief Consolidated Mining Company "and were mined and operated together with other mining claims and mining properties of such company as one mine; and the said Chief Consolidated Mining Company did, during the years 1923 and 1924, make large extractions of ore from its said mine, including the mining claims particularly described in the affidavit" of the plaintiff; and "that the ores extracted from the mining claims particularly described in said affidavit consti-

tuted but a fractional part of all of the ores extracted by the Chief Consolidated Mining Company from its said mine; and that the net annual proceeds from ores extracted from that portion of the mine of the said Chief Consolidated Mining Company lying within the limits of Mammoth City for taxable purposes during the years 1923 and 1924 was less than $135,000 per year." The board denied that the Chief Consolidated Mining Company failed to make out and file a report to the board, and alleged that the company "did make out and file with the said board of equalization and assessment the statement" as required by law "for each of said years; and that said statement included the gross yield of extractions of ore from the said mine of the said Chief Consolidated Mining Company, including that portion thereof lying within the limits of Mammoth City"; and that the board "did assess the mine and mining properties of the said Chief Consolidated Mining Company for the years 1923 and 1924, including the mining claims particularly described" in the affidavit of the plaintiff; and that "it apportioned said assessment to the county in which such mine and mining properties are located, and by said apportionment it returned to Juab county, State of Utah, for each of said years, the proper proportion of each of said assessments"; and further alleged that the Chief Consolidated Mining Company "filed the statement required by law and did furnish all information required and necessary to enable said board of equalization and assessment to determine and assess the net proceeds from said mine." The board admitted that a portion of the mine, and the mining claims of the Chief Consolidated Mining Company as described in the affidavit of the plaintiff, lay within the corporate limits of Mammoth City, but alleged that no duty was imposed on it "to segregate to taxing units within any county the assessment of property returned to such county by said state board of equalization and assessment, and further alleges that such duty is imposed by law upon the board of county commissioners of each county, and that if Mammoth

City has failed to receive its proper proportion of the tax upon the properties of the Chief Consolidated Mining Company for the year 1924, that such failure is not due in any manner or at all to any dereliction of duty on the part of the said board of equalization and assessment." The board further alleged that it had no knowledge or information as to the amount of taxes received by Mammoth City for the year 1924, on account of the assessment made against the property of the Chief Consolidated Mining Company, or as to the amount of taxes which ought to have been received by it for that year, but alleged the facts to be that "said Chief Consolidated Mining Company has paid all taxes levied by said Juab county on the assessment of proceeds from its said mine and mining claims for the said year 1924," and denied that there was due Mammoth City from the Chief Consolidated Mining Company on account of taxes for the year 1924 the sum of $22,500 or any other sum, and denied each and every allegation in the affidavit of plaintiff contained not specifically admitted.

On these pleadings the matter came on for hearing. No evidence of any kind was adduced except the reports made and filed by the Chief Consolidated Mining Company to and with the board for the years 1923 and 1924, and a copy of the board's "record of assessment." The reports made by the Chief Consolidated Mining Company were made on blanks furnished the company by the board. For 1923 the report is:

"*Annual report.*—Statement of net proceeds for the year 1923. Owner, Chief Consolidated Mining Company. Address, Eureka, Utah. Name of mine, Chief Consolidated. Agent, W. Fitch. County where located, Juab. Address, Eureka, Utah."

Then follows statements of amounts of fine ounces of gold and silver, pounds of lead, copper, zinc, and tons of ore, and a "gross yield in dollars, $5,108,063.34." From that is deducted costs of extraction, reduction, transportation, con-

struction, and repair of mills and reduction works, aggregating $3,685,323.11, leaving total net proceeds of $1,422,-740.23, which, multiplied by 3, amounted to $4,268,222.69, value of mine based on three times net proceeds." A similar report was made for the year 1924, showing net proceeds of $1,083,272.43, which, multiplied by three, amounted to "$3,249,817.29, value of mine based on three times net proceeds." To each of these reports is attached the oath or affidavit of the secretary of the company, wherein, among other things, he deposed that he had read the report and knew the contents thereof, and that it correctly set out "the gross yield and net proceeds from all ores extracted and marketed during the year by the said company, and including the proceeds from all ores extracted by lessees from the property of said mining company, and the proceeds from all dumps and tailings worked during the year by the said company." Thus, the report as made was a statement of gross and net proceeds derived "from all ores extracted and marketed" by the company during the year. Upon such reports the board's assessment was made on the basis of net proceeds and on the amount thereof as so reported. Its record of assessment shows,

"Record of assessment for the year 1923 of the Chief Consolidated Mining Company, based on three times net proceeds. Address of owner or agent, 814 Newhouse building, Salt Lake City, Utah. Schedule No. 3 for Juab county, Utah."

The record then recites: 5,397 fine ounces of gold, 3,936 fine ounces of silver, 18,828,548 pounds of lead, 117,046 pounds of copper, 113,810 tons of ore, and, "gross yield in dollars, $5,108,063.34." From that deductions for cost of extraction, reduction, transportation, construction, and repair of mills and reduction works are made aggregating $3,662,730, leaving "net proceeds $1,445,332, value of mine based on three times net proceeds, $4,337,998." A similar record for the year 1924 is shown, except that the address of owner or agent is "W. Fitch, Eureka, Utah," and the gross

yield in dollars stated to be $5,903,223.57, total deductions $4,819,951.10, and "net proceeds $1,083,272.40, value of mine based on three times net proceeds, $3,249,817." There also were shown sheets of the board's record of assessment for the year 1924 "upon the property of the Chief Consolidated Mining Company, Grand Central Mine, Mammoth, address of owner or agent, W. Fitch, Eureka, Juab county, Utah," showing an assessment of machinery, supplies, personal property and improvements aggregating $297,415.

No further evidence was adduced. On a hearing had, in which counsel for the Chief Consolidated Mining Company appeared with the Attorney General for the board but not for the company, it not being a party to the proceedings, a conclusion was reached by us that no assessment was had for the years in question on the net proceeds of the mines and mining claims mentioned in the affidavit or petition of plaintiff and located within the corporate limits of Mammoth City, and thus directed the board "to assess the net proceeds of the mines and mining claims enumerated in the affidavit and located within the boundaries of Mammoth City, with the ores taken from such mines and mining claims, for the years 1923 and 1924. For that purpose the defendant board is directed to request the Chief Consolidated Mining Company to file with it a statement showing net proceeds of ore taken from said mines and mining claims for each of the years 1923 and 1924. In the event the mining company neglects or refuses to prepare and file the statement for each of such years, then the defendant board is directed to assess such mines and mining claims from the best information and knowledge it can obtain as provided in section 5934," Comp. Laws Utah 1917, as amended by Laws Utah 1919, c. 114. A petition for a further hearing, which in effect was for a rehearing, was filed asking a re-examination and reconsideration of the case. We granted the petition and a further hearing was had, but no additional evidence was adduced nor were there any different or additional pleadings or issues presented.

Because we were not fully of one accord when the original opinion went down and because the questions involved are of public concern, we have concluded to examine the case afresh. At both the original and rehearing of the case the parties broke loose and strayed from the pleadings and more or less wandered at large, to the confusion of most all concerned, and discussed and invited decisions on matters not involved within the issues. We thus conclude to restrict and confine the parties within reasonable limits of the pleadings, for, after all, whatever we do we ought not go beyond these.

As is seen by the affidavit and petition of Mammoth City, it, in asking for the writ, proceeds on the theory that no assessment was made of the net proceeds of ore extracted from the mines and mining claims situate in Mammoth and mentioned in the affidavit, and that the board made no apportionment of such assessment to the county ■ commissioners of Juab county for the years 1923 and 1924, and that thereby Mammoth City in 1924 lost $22,500 in taxes, but what, if any, it lost in 1923, is not averred, and that the board thus be directed to make an assessment as by law in such case made and provided. As also is seen, all such allegations are denied by the board and put in issue. While the plaintiff did not make a motion for judgment on the pleadings, yet the course pursued by it at the hearing amounted to that, except the production of the filed reports of the Chief Consolidated Mining Company and the board's record of assessment heretofore referred to. The plaintiff, offering no further proof in support of its petition, and by pursuing the course it did—in effect moving ■ for judgment on the pleadings—must otherwise for such purpose take as untrue all that is alleged in the petition and well denied, and as true all that is well alleged in the answer in response to the petition. When we are asked by mandate to direct the board or any tribunal to perform an act, it must be clear that the act is one which by law is specifically enjoined. If that, either as matter of law or

fact is not manifest, the writ should be denied. We, as well as other courts, many times have so held.

Though it be assumed that the affidavit of plaintiff contains sufficient averments to show that no assessment was made and that the board now ought to be required to make one, yet, the allegations in such respect are sufficiently controverted and put in issue to resist a motion for judgment on the pleadings. In the presentation of the cause and in argument of it more or less talk and discussion of a desultory nature were indulged by counsel for both parties respecting some of the conditions and circumstances as to the management and operation of the mines and claims in question and kindred matters, but none of which was given as or in the nature of a stipulation of facts, and most of it in discord—one counsel asserting one thing and other counsel another and different thing—except that the mines and mining claims in question were located within the corporate limits of Mammoth City and that prior to and some time in 1922 such claims were operated by the Grand Central Mining Company, and since then conveyed to, owned and operated by, the Chief Consolidated Mining Company, counsel for plaintiff stating, separately from other mines and claims owned and operated by it, and counsel for the board, in connection with such other mines and as one mine and as alleged by the board in its answer. No request was made to amend the pleadings in any particular or to agree upon a stipulation of facts, nor was there one agreed to nor was there any filed. Counsel merely continued with their divers dissertations of what each regarded the facts to be concerning the operation and management of the mines and mining claims in question, regardless of the pleadings, proof, or of any stipulation. Parties must make their own record in a cause. We cannot make it for them. And the record made by them limits and prescribes our judicial action; and whatever is finally done must be based upon the record and not on discussions of fact and circumstances not averred or proved or stipulated or in some manner brought in the record.

However, though it be assumed that the answer put in issue the allegations of the petition, except that the mines and mining claims in question were in Mammoth City, yet, it is contended that the reports made to the board by the Chief Consolidated Mining Company and the board's record of assessments for the years in question show either ▪ (1) that no assessment was made on the basis of net proceeds derived from the extraction of ore from the mines and claims in question for those years, or (2) that no assessment was made as by law provided, and that in either such case the board should be directed to now make a proper assessment on the basis of such net proceeds. And it is from that viewpoint that we now further examine and consider the case and not from the desultory talks and discussions of counsel wholly without the record and unsupported by proof. Considering such question, both counsel have referred us to these provisions of the statute by them deemed pertinent thereto:

Section 5873, Comp. Laws Utah 1917, as amended by chapter 114, Laws Utah 1919, providing that the state board of equalization shall assess all mines and mining claims, etc., all machinery used in mining, etc., all property and surface improvements upon or appurtenant to mines or mining claims, etc., and the value of metalliferous mines based on some multiple of the annual net proceeds thereof, which later was fixed at the multiple of three times such net proceeds.

Section 5929, Comp. Laws Utah 1917, as amended by chapter 114, Laws Utah 1919, which, so far as material, is:

"Every person, corporation, or association engaged in mining upon a vein or lode or placer mining claim, containing any gold, silver, or other metalliferous mineral deposits, must each year make out a statement of the gross yield of the above named metals or minerals from each mine owned or worked by such person, corporation or association during the year next preceding the first day of January, and the value thereof, which statement shall give the fine ounces of gold and silver, and pounds of lead, copper and other metals, together with the

expenditures in extracting the ore and reducing the ore and converting it into money, which statement shall show the net proceeds of such mine, including the net proceeds of leases on said mine, and the net proceeds from dumps and tailings. Also a statement showing all the machinery used in mining, and all property and surface improvements upon or appurtenant to each mine or mining claim, owned or worked by such person, corporation, or association during the year preceding the 1st day of January, and the value of the same at 12 o'clock noon on the 1st day of January.  *  *  *"

### Section 5932:

"The state board of equalization must, prior to the first Monday in May of each year, assess the mines, mining claims and mining property, and before the third Monday in June apportion the total assessment of the mines to the several counties in which the mines are located. The state board of equalization must prepare each year a book called the 'Assessment Book of Mines,' in which must be entered the assessment of all mines in the state subject to assessment by this board and in which must be specified in separate columns, and under the appropriate head: 1. Owner of mine. 2. Name and description and location of the mine. 3. County in which it is situated. 4. Net proceeds in dollars, if a metalliferous mine. 5. Value of mine. 6. Value of machinery. 7. Value of supplies and other personal property. 8. Value of improvements. Together with such other information as the board may determine."

### Section 5934:

"If any person, corporation or association engaged in mining or owning mining property, as mentioned herein, refuses or neglects to make and deliver to the state board of equalization the statement mentioned in this chapter, the state board of equalization must assess and list the mining property, from the best information and knowledge it can obtain. Such person, corporation or association refusing, upon demand, to furnish statement to the state board of equalization, shall be subject to a like penalty as is provided in subdivision 2, section 5981, and in section 5882 for failure to furnish statement to a county assessor," which is, that the taxpayer is precluded from questioning the value so fixed by the board.

### And section 5908, Comp. Laws Utah 1917:

"Any property discovered by the assessor to have escaped assessment may be assessed at any time, and when so assessed shall be reported

by the assessor to the auditor, and the auditor shall charge the county treasurer with the taxes on such property, and the treasurer shall give notice to the party assessed therewith."

In virtue of these statutory provisions it is the contention of the plaintiff that it was the duty of the Chief Consolidated Mining Company, the owner of the claims in Mammoth City as well as the owner of other mines and claims not within the corporate limits of that city but in Juab county, in making its report to the board during the years in question, to have shown and reported what gross and what net proceeds were had from each mine or mining claim in Mammoth City, or, if not from each of such mines and mining claims, at least what gross and what net proceeds were obtained from the group of mines and claims in Mammoth City and what from mines and claims situated elsewhere in the county; and, inasmuch as the company did not make such a report, it having as is seen but reported the gross and net proceeds in the aggregate from all its mines and claims in the county, including those in Mammoth City, and since from such reports it cannot be ascertained what of such net proceeds were obtained from the mines and mining claims in Mammoth City and what from mines and mining claims situated elsewhere in the county, it became the duty of the board either to require such a report from the company and on its refusal to make one that the board itself, by the best means obtainable, ascertain such fact and report it to the board of county commissioners of Juab county; and inasmuch as the board also failed and refused to do so, the board should be directed now to make a reassessment, or at least ascertain and make a segregation of such net proceeds and make proper entries thereof in its book or record of assessments.

On the record we think the alleged facts in the petition that no assessment was made on the basis of net proceeds of the mines and mining claims in question, the burden to show which was on the plaintiff, are not sufficiently shown

to justify a finding in such particular in favor of the plaintiff. To the contrary we think it is indisputably shown that the company reported to the board the gross and net proceeds derived by it "from all ores extracted and marketed" by it during each of the years in question, and that the assessment which was made was made on the basis of net proceeds of all such ores, and of necessity including those extracted from the claims in Mammoth City.

While the plaintiff in its petition averred that the mines and claims in question were owned by both the Grand Central Mining Company and the Chief Consolidated Mining Company, yet, such joint ownership was denied by the board, and it was averred by it that in 1922 the Grand Central Mining Company sold and conveyed such mining claims to the Chief Consolidated Mining Company, who then became the sole owner of them and consolidated them with other mines and claims owned by it, and during the years in question "were mined and operated together with other mining claims and mining properties of said company (the Chief Consolidated Mining Company) as one mine." That is not alleged as a conclusion either of law or of fact, but as an ultimate fact. The plaintiff, offering no proof to the contrary, and in effect moving for judgment on the pleadings, must, for purposes of this case, be held to assume as true such averments in the answer. In harmony with such fact, the Chief Consolidated Mining Company, on blanks furnished by the board, for the years in question, reported to the board what gross and what net proceeds were obtained by it from its mines and mining claims, including those in Mammoth City—from all ores extracted by it—without segregating what of such proceeds were obtained from the mines and mining claims in Mammoth City and what from mines and mining claims elsewhere in the county, and all of such net proceeds assessed by the state board and the total of such assessments apportioned by it to the board of county commissioners of Juab county. The board apparently was satisfied with and approved such reports made to it, and so, too, seemingly,

was the board of county commissioners with the apportionment of the total assessment as reported to it by the state board. No complaint was or is now made by either of a want of any assessment, or of any imperfect, defective, or insufficient assessment or apportionment; nor by allegations or proof is it made to appear that the amount of net proceeds as reported by the company of all its mines and claims in the county and apportioned to the county commissioners was not accurately reported or that any net proceeds were withheld. It is averred and not denied and not anything to show the contrary that the whole of the tax based on the net proceeds of all the mines and mining claims of the company—from all ores extracted by it—and all the taxes in such respect levied and demanded to be paid by the company, were paid in full.

It is our opinion that the reports made by the company to the board, and the board's record of assessment, instead of showing that no assessment was made on the basis of the net proceeds of the mines and mining claims in question, show that such an assessment was made in connection with net proceeds of other mines and claims of the company in the county. The most that can be said is that on the face of the reports and of the board's record of assessments it cannot be determined what gross and what net proceeds were obtained from the one and what from the other mines or mining claims. Though it be assumed, as contended by the plaintiff, that the gross and net proceeds of each mine and mining claim ought to have been separately reported by the company, or, if not that, that the company at least ought to have reported what gross and what net proceeds were obtained from the group of mines and mining claims within Mammoth City, and upon a failure of the company so to do that the board itself ought to have ascertained such facts and entered them on the assessment record in assessing the net proceeds, yet that does not justify a holding that no assessment was made of net proceeds of ore extracted from the mines and mining claims in question, or that the

assessment which was made is a nullity, or the giving of a direction that an assessment or new assessment be now made as though none had theretofore been made. The board averred that the net proceeds obtained by the company from the mines and mining claims in Mammoth City for the years in question were less than $135,000 per year. That is not denied, and by the course pursued by the plaintiff (in effect demanding judgment on the pleadings) such averment must be taken as true by the plaintiff. But it also is averred by the board and not denied, and in effect also admitted, that the tax based on such net proceeds, together with the tax based on all other net proceeds assessed against the company, was paid by it. Thus, on the record, it stands undisputed that the company was assessed on the basis of net proceeds derived by it from all ores extracted from the mines and mining claims in question, and that the company paid the whole of the tax based thereon. Because the state board did not make it appear on the record of assessment what net proceeds were so derived from the mines and mining claims in question does not justify us in regarding such assessment as a nullity and directing the board to now make an assessment as though none had been made. We have no allegation or proof that the assessment which was made was made fraudulently, or based on a gross or any undervaluation, and no proof that such or any net proceeds of such mines or mining claims were omitted from assessment, or that they escaped assessment or taxation.

It is claimed that on the face of the board's record of assessment, on the basis of net proceeds of ore derived by the company from its mines and claims in Juab county for the years 1923 and 1924, none of the claims in Mammoth City and mentioned in the affidavit or petition of the plaintiff is named on the record as having been assessed, was not eo nomine assessed, and thus the conclusion is reached that none of such claims was assessed, notwithstanding in the answer of the board it was alleged, and as has been seen in effect admitted, that all of such claims were by the

Chief Consolidated Mining Company consolidated, mined, and operated by it, together with other mines and claims owned by it, as one mine, and the total net proceeds derived from all of them assessed and the taxes based thereon fully paid. Considering the reports made by the company, the board's record of assessment, and the pleadings, we think it appears that the company was assessed on all its net proceeds from all ores extracted from all its mines and claims, including those in Mammoth City. If that be true, as we think it is, and the tax based thereon paid, the assessment, though it be assumed that the names of the mines and claims so assessed, the taxing district in the county in which each mine and claim is located, and the net and gross proceeds of each, ought to have been but were not indicated or entered on the record, nevertheless is not of such infirmity as to justify us at the instance of the state or of any taxing district to regard the assessment invalid and direct an assessment to be made as though none had been made; for, in such case, such failure or ommission would constitute but a defective description of which the taxpayer, if the description was not sufficient to identify the property assessed with reasonable certainty and to inform him for what he was taxed, might complain before he paid the tax, or to justify payment of it under protest, but of which neither the state nor other taxing authority may do so after the tax has been paid. The purpose of a proper and sufficient description of property assessed is for the benefit and protection of the taxpayer, to inform him for what property he is assessed, and whatever description is sufficient to identify the property with reasonable certainty so that the owner or taxpayer cannot be misled is a sufficient description. 37 Cyc. 1051; San Francisco v. Flood, 64 Cal. 504, 2 P. 264; San Francisco v. Pennie, 93 Cal. 465, 29 P. 66.

Where there is no sufficient description of the property assessed to identify it with reasonable certainty, or fairly to apprise the taxpayer for what property he is assessed,

he may enjoin the collection of the tax, or if property owned by him has been sold for non-payment of such a tax, he may treat the sale as a nullity and have it set aside or a certificate of sale or deed based thereon canceled. It is doubtful whether the description of the property here assessed was of such character where even the taxpayer could properly complain. The company here was assessed on the basis of net proceeds derived from all ores extracted from its mines and claims mined and operated by it in the county. The name of each mine or claim and the location of it in the taxing district in the county, and what gross and what net proceeds were derived from each, not having been indicated or entered on the board's record of assessment, could hardly be said to have misled the company or be regarded as not apprising it for what property or net proceeds it was assessed. If because of such failure the company could not be heard to complain of such a description and for such reason assail the validity of the assessment, we know of no principle of law whereby the state or any other taxing authority may do so after the tax has been paid.

However, though it be assumed that because of the failure to indicate or enter on the assessment record the name or names of each mine and claim, the taxing district in which each is located, and the amount of gross and net proceeds derived from each, the assessment was invalid, and for such reason the taxpayer, before he paid the tax, could have enjoined the collection of it, or set aside a sale for the non payment of it (a proposition to which the cases cited by the dissenting members relate), yet that, after the tax was paid, would not give the state or any other taxing authorities the right to treat such assessment as a nullity, make another as though none theretofore had been made, and collect a tax based thereon. As to that we think the case of Shackelford v. McGlashan (1921) 27 N. M. 454, 202 P. 690, 23 A. L. R. 75, is in point. There one Schroeder was the owner of 160 acres of land situate in the S. W. ¼ of section 17,

township 9 north, range 3 east, in Bernalileo county, the only 160 acres owned by him. The assessor making up the assessment roll and entering an assessment against Schroeder described the property as the "S. W. ¼, section ........, township 17, range 5 east," which, as so described, located the land in the county of Sandoval. But, under such assessment Schroeder paid the taxes levied, intending thereby to pay the taxes on the 160 acres owned by him. For the same year the assessor made an additional assessment against "unknown owners," and therein correctly described and assessed the lands owned by Schroeder. That tax was not paid, the land sold for nonpayment thereof, and the tax deed and subsequent conveyances made upon it canceled by the court. Among other things, the court there says:

"The question in this case is whether payment of the tax has in fact been shown, or, in other words, whether payment under this assessment, which improperly described the land was good payment on the land he owned. It is conceded that appellant intended by this payment to pay the tax on his land and believed that he was doing so. Since the treasurer of the county accepted the money, it must be assumed that he understood it was payment on the same land, for he certainly would not knowingly accept the payment of taxes upon land not within his county. We have, therefore, a case where the owner has paid money to the county as taxes on a certain piece of land, and the county has accepted it as payment on that land, although in fact the land was not properly described on the tax roll and can only be identified by proof of circumstances wholly apart from the roll itself.

"The assessment under which this tax was paid was not a valid one. It would not have supported the tax sale based upon it. On the record presented to us the assessment to 'unknown owners' was a valid assessment, and the tax sale based upon it was regular on its face. * * *

"We are determining whether payment under an assessment, invalid because it fails to describe the land sufficiently for identification, is good payment on the land intended to be assessed, so as to avoid a sale under another assessment with a proper description. * * *

"It being admitted in this case that Schroeder acted in good faith, intended to return his land, intended to pay the taxes upon it, and believed that he had done so, and that the county authorities accepted the payment with the same understanding, we hold that it was good payment in fact upon the 160 acres of land which he then owned,

and that this payment was a bar to any sale under the second assessment to 'unknown owners' may be shown in avoidance of it, and when so shown defeats it."

In support of the conclusion there reached the court cites *Kellogg* v. *McFatter*, 111 La. 1037, 36 So. 112; *Meller* v. *Hodsdon*, 33 Minn. 366, 23 N. W. 543; *Bender* v. *Bailey*, 138 La. 433, 70 So. 425; and *Lewis* v. *Monson*, 151 U. S. 545, 14 S. Ct. 424, 38 L. Ed. 265, which as we too think well support it. The case is also approved by the author, Cooley, Taxation, vol. 3, § 1258 (4th Ed.) Analogous thereto are, also, the cases of *Adams* v. *Luce*, 87 Miss. 220, 39 So. 418; *Robertson* v. *Bank of Yazoo City*, 123 Miss. 380, 85 So. 177; *Woll* v. *Thomas*, 1 Ind. App. 232, 27 N. E. 578; *City of Cape Girardeau* v. *Buehrmann*, 148 Mo. 198, 49 S. W. 985; *Florer* v. *Sherwood*, 128 Ind. 495, 28 N. E. 71.

These cases also show that on the record before us the net proceeds of ores from the claims in Mammoth City may not be regarded as having escaped or as having been omitted from taxation, because such claims were not eo nomine assessed on the record or not sufficiently or erroneously described, and that payment of taxes made on property, though on an invalid assessment, is a complete defense to another and valid assessment and tax based thereon. As to that we do not find any substantial conflict in the authorities. The cases cited by the dissenting members go not, as we think, to that question, but to questions where the taxpayer himself may avoid an invalid assessment or where taxes on an invalid assessment have not been paid and he is called upon to pay a proper tax on another and valid assessment.

However, as we think, a complete answer to the claim of net proceeds having escaped assessment or taxation is that the company was assessed on the basis of all net proceeds "from all ores extracted and marketed" by it during each year in question and the tax based thereon fully paid.

The plaintiff not having sustained its allegations that no assessment was made on the basis of net proceeds of

the mines and mining claims in question, and having admitted that the net proceeds from such mines and mining claims amounting to about $135,000 were assessed and the tax based thereon paid, is thus left to the further proposition that inasmuch as such net proceeds were not by the company's report or by the board's record of assessment segregated from the total aggregate of net proceeds of the company as reported and assessed, the state board apportioning such total assessment without segregation to Juab county, and inasmuch as the county commissioners of that county, acting as a board of equalization for the county and required to apportion property assessed therein, including the net proceeds apportioned to that county by the state board, "to the several city, town, school, road, or other lesser taxing districts in the county" (section 5925, Comp. Laws Utah 1917), did not apportion any assessment of such net proceeds to Mammoth City, whereby it lost the taxes due it as alleged by it, though denied by the board, to be $22,500. Such a proposition involves and presents questions respecting the kind of apportionment required to be made by the state board to the county and to be made by the county board, and whether there was any fault or neglect in making a proper apportionment, and, if so, whether it was the fault of the state or of the county board, and, if of the former, whether Mammoth City may now be heard to complain and by mandamus seek a correction and require the board to make another, different, and proper apportionment, or a segregation of net proceeds, and so as to show what gross and what net proceeds were derived from the mines and mining claims in question within the corporate limits of Mammoth City. In that connection the further pertinent question is, though we direct the state board to now ascertain what gross and what net proceeds were derived from such mines and mining claims and to segregate such amount from the total assessment of net proceeds and transmit such facts or report to the county commissioners of Juab county, of what avail is that now to the plaintiff?

The tax based thereon admittedly has been paid. May the county commissioners now make another apportionment based on such new or additional or further report or apportionment of the state board and demand a tax based thereon from the company and require it to pay the taxes which it already has paid, or may other taxing authorities of the county of the plaintiff do so? Surely the company may not thus be penalized and subjected to double taxation. Or may the plaintiff maintain an action for money had and received, or some other action, against the county, or some taxing district within the county having received the tax which Mammoth City ought to have received? We need not answer that, except to say that such a procedure at most is of doubtful cognizance, for, to permit the city to go back and undo apportionments long past made and completed and acted upon by the various taxing districts in the county, and after taxes have been levied, collected, paid, and expended in accordance therewith, would result in administering a remedy more harmful than the wrong sought to be redressed and disturb, if not abrogate, the whole system or procedure of levying and collecting taxes.

Recurring now to the kind of apportionment to be made by the state board to the county: Section 5932, supra, provides that the state board must, "prior to the first Monday in May of each year, assess the mines, mining claims and mining property, and before the third Monday in June apportion the total assessment of the mines to the several counties in which the mines are located." That the state board admittedly did, except that it did not segregate the assessment so as to show what net proceeds were assessed on mines and mining claims located in the various cities, towns, school districts, or other taxing districts in the county. And therein is the real bone of contention in this case. The same section further provides that the board shall each year prepare a book calld "the Assessment Book of Mines," in which must be entered the assessment of all mines in the state subject to assessment of the state board, and in which

must be specified in separate columns, under appropriate headings, owner of mine, name and description and location of mine, county in which it is situated, net proceeds in dollars if a metaliferous mine, value of mine, machinery, supplies, and other personal property, and of improvements. It is not contended that the state board is required to transmit to the respective counties in which mines, mining claims, and mining properties are assessed, copies of such assessment book. It, however is contended that the state board is required to make such entries in the assessment book for the benefit of county commissioners who, on inspection of the record, may ascertain what net proceeds were assessed on mines and mining claims situate in the various cities, towns and other taxing districts in the county, and thus enable them to make a proper apportionment of the assessment to such cities, towns and other taxing districts.

Whatever force the contention may have, nevertheless, the fact remains that the duty of making such apportionment to the various cities, towns, and other taxing districts in the county rests on the county commissioners sitting as a board of equalization and not on the state board. As to the latter, the statute but provides that it shall assess the mines, mining claims, and mining property in the state, and before the third Monday in June "apportion the total assessment of the mines to the several counties in which the mines are located." By no express language does the statute require the state board to do more. Whether that is sufficient to properly apprise the county commissioners sitting as a board of equalization in making apportionments to the various cities, towns, etc., in the county is a matter of legislative and not of judicial attention. We have no right to enlarge upon it and for guidance to the county board in making its apportionment require the state board to do more than the statute itself in such particular demands. Sections 5925, Comp. Laws Utah 1917, and section 5933, Comp. Laws Utah 1917, as amended by chapter 114, Laws Utah 1919, provide that assessments made by the

state board of railroads, telegraph lines, express companies, etc., and of mines and mining claims and mining properties, and apportioned to the several counties, shall, by the county commissioners sitting as a board of equalization for their respective counties, be apportioned to the various cities, towns, and other taxing districts in the county. It thus seems clear that in making the apportionment of assesments made by the state board the duty is cast upon the county board and not on the state board to apportion such assessments to the various cities, towns, etc., in the county. And in the absence of express statutory requirements we are not authorized to require the state board to make such an apportionment, however needful or beneficial it might be to the county board. As to that the Legislature and not we must speak.

Further as to this: The statute, section 5926, Comp. Laws Utah 1917, provides that if the owner of any property assessed by the state board of equalization is dissatisfied with the assessment made by the state board, such owner, upon the third Monday in May and the second Monday in June, may apply to the board to have the same corrected in any particular. Section 5974 et seq. also provide for hearings before the board of county commissioners not later than the second Monday in June, but the state board (section 5984), whenever it may deem necessary, may reconvene the county board of equalization. And then section 5928 provides that the assessment made by the county assessor and that of the state board of equalization, "as apportioned by the board of county commissioners to each city, town, school, road, or other district in their respective counties, is the only basis of taxation for the county or any subdivision thereof, and for incorporated cities and towns." Thus, though an improper apportionment had been made due to the fault or neglect of either the state or county board, or both, and thereby a city or town or other taxing district in the county is deprived of its just proportion of the assessment and the tax based thereon, still,

the question is, and as we think the most important and controlling in the case, may the city or town, after the apportionment has been made and wholly completed, lie by and wait until the taxes based on the apportionment of the assessment have been levied, collected, paid and expended, and then complain and seek to undo the apportionment? That, in effect, is what the plaintiff here seeks to do. We think it may not do so. To permit it is unjust, not only to the taxpayer, but to the various cities, towns, and other taxing districts in the county who, on the basis of the assessment as apportioned, levied their taxes and fixed their tax rates, and collected and expended their taxes accordingly. In such respect we think the case of *Juab County* v. *Bailey,* 44 Utah, 377, 140 P. 764, *Rich County* v. *Bailey,* 47 Utah, 378, 154 P. 773, and *Ririe* v. *Randolph,* 51 Utah, 274, 169 P. 941, are controlling.

In the first case it was contended by Juab county that the state board of equalization assessed and apportioned to Utah county a large amount of net proceeds derived by the Iron Blossom Consolidated Mining Company from ores extracted from mines situate in Juab county, and thereby the latter county lost a large amount of taxes which went to Utah county. Juab county applied to the state board for a hearing to make such fact evident and to induce the board to make a correct and proper apportionment of net proceeds to Juab county. The board denied the request, and hence Juab county applied to this court for a writ of mandate to direct the board to grant the hearing. The writ was denied. The court there had under consideration substantially the same statutes here under consideration. They are referred to at some length in the opinion. With respect thereto this court there said:

"It will thus be seen that it is absolutely necessary that the assessment, equalization, and apportionment of all property be completed within a certain period of time which is prescribed by the statute for the reason that the rate of taxation can only be determined and the levies made for the purpose of raising the necessary revenues after

the valuation and apportionments are finally determined and certified."

## Upon further considerations the court also said:

"We are of the opinion therefore that, if plaintiff desired to assail the correctness of the report made by the mining company, it was required to do so at some time before the apportionment was finally transmitted. To require the state board of equalization to reopen the matter after it had made the apportionment and the rate of taxation has been determined must result in producing gross uncertainty with respect to the amount of revenue any particular county will receive for a particular year. Suppose it should ultimately be decided that Utah county should surrender $500,000 of net proceeds to Juab county after Utah county has determined the rate of taxation upon the whole amount of property within said county, including said $500,000, will not the amount of revenue for Utah county be reduced very materially while the amount for Juab county will be correspondingly increased? Utah county may thus suffer a deficit in its revenues, while Juab county may have a surplus."

## Again said the court in that case:

"Assuming therefore that plaintiff may assail the correctness of the reports made by those engaged in mining, it has ample time and opportunity before the apportionment is transmitted to ask the state board of equalization for a hearing upon that matter if a hearing is necessary. If plaintiff can prevail in the present application, why can it not open up the apportionment made for the year 1912 and for the preceeding year? Clearly, the property owner who may have been excessively assessed would be denied such relief, and we cannot see how plaintiff can be given any greater rights."

## In Rich County v. Bailey, the syllabus sufficiently reflects the decision:

"Where an application for a writ of certiorari to review the action of the state board of equalization in apportioning to S. county for taxation railroad property claimed to be located in R. county was not applied for until after the second Monday in August, the date on which apportionments were required to be made by the county commissioners of the several counties of the state to the lesser taxing units, and the board did not clearly exceed its powers or jurisdiction, a peremptory writ would not be granted, in view of the disturbance of apportionments and tax levies in S. county and the mischievous consequences which would result."

In Ririe v. Randolph, supra, this court again said:

"But the application was not filed in time. It was not filed in this court until the 25th day of August of the present year. At that time the assessment had been completed, the taxes equalized, the rate established, the funds apportioned, and the assessment roll had passed entirely beyond the control of every party defendant in this proceeding. The official power of these parties in respect to the matters complained of had completely expired under the statutes of this state, and this court cannot, without authority of law, clothe them with power to correct the wrongs complained of. If they have not the power to perform under the law, we cannot require performance at their hands. This principle is elaborately discussed and elucidated by Mr. Justice Frick in an opinion by this court in the case of *Juab County* v. *Bailey et al.*, 44 Utah, 377, 140 P. 764. See, also *Rich County* v. *Bailey et al.*, 47 Utah, 378, 154 P. 773. These well-considered cases clearly enunciate the principles by which we are governed in cases of this kind. They also appear to be in harmony with the law generally in other jurisdictions, and need not be further elaborated in this opinion."

From these considerations it follows that the opinion heretofore rendered by us in the cause ought to be recalled, and the order or judgment of this court based thereon reversed and vacated, and the writ applied for denied. Such is the order.

In reaching this conclusion and judgment we are not unmindful of the desire expressed by the parties that we indicate that, though a number or group of mines and mining claims, are, as alleged in the answer of the board, owned by one person or company and by him or it mined and operated together as one mine, and though such mines and mining claims are all in one county, yet some in one and some in another city, town or other taxing district in the county, whether or not the state board, in assessing such mines and claims on the basis of net proceeds and in preparing its yearly assessment book of mines, nevertheless is required to ascertain and enter in such book the name and description of each of such mines and mining claims and the location of each, not only as being in the county but also in what city, town, or other taxing district in the county, and

ascertain and enter in such book not only the aggregate gross and net proceeds of such group or number of mines so operated and mined together, but also to ascertain and enter in such book the gross and net proceeds from ores extracted from each of such mines and mining claims constituting the group, and in such connection that we also define what is and what is not a mine or mining claim for taxing purposes within the meaning of the statute. From the conclusion reached that the plaintiff may not now, for the reason stated, undo or correct or modify the apportionment heretofore made, it is apparent that whatever view may be expressed by us with regard to such other questions would not in this case inure to the benefit of the plaintiff nor produce or justify a different result, and thus we find it unnecessary to express any opinion concerning them, and prefer to deal with them in a case where they are involved and necessary to a decision.

FRICK and CHERRY, JJ., concur.

GIDEON, C. J., and THURMAN, J. We dissent from the opinion of Mr. Justice STRAUP, and, assuming that it expresses the views of the majority, we shall henceforth refer to it as the opinion of the court.

In the main we agree with the statement as to the issues presented by the pleadings, but we disagree fundamentally with the conclusions drawn therefrom. The opinion quotes, as far as material here, the various sections of the statutes relating to the assessment of mines. In addition to these statutes we here quote the amendment to the state Constitution (Article 13 § 4), relating to the same subject:

"All metalliferous mines or mining claims, both placer and rock in place shall be assessed at $5.00 per acre, and in addition thereto at a value based on some multiple or sub-multiple of the net annual proceeds thereof. All other mines or mining claims and other valuable mineral deposits, including lands containing coal or hydrocarbons, shall be assessed at their full value. All machinery used in mining and all property or surface improvements upon or appurtenant to

mines or mining claims, and the value of any surface use made of mining claims, or mining property for other than mining purposes, shall be assessed at full value. The state board of equalization shall assess and tax all property herein enumerated, provided that the assessment of $5.00 per acre and the assessment of the value of any use other than for mining purposes shall be made as provided by law."

We also quote the following from the state Constitution, art. 1, § 26:

"The provisions of this Constitution are mandatory and prohibitory, unless by express words they are declared to be otherwise."

Now, as to the issues involved: It is alleged in the application of plaintiff that certain mines, which for convenience we will denominate "the Grand Central mine" are situated in Mammoth City, Juab county; that they are owned and operated by the Chief Consolidated Mining Company and the Grand Central Mining Company; and that said mines were not assessed by the defendant board for taxation purposes in 1923 and 1924; that during said years said mining companies extracted large quantities of ore from said mines, the net proceeds of which were of the approximate value of $1,500,000. It is then alleged that in 1924, plaintiff levied a tax of 15 mills on the $1 of the assessed valuation of all taxable property within the city, and because of the failure of the defendant board to assess said mines plaintiff was deprived of the tax, which, on its information and belief, plaintiff alleges amounted to the sum of $22,500.

Whether or not the Grand Central mine was assessed by the defendant board during the years 1923 and 1924, is the vital issue in the case. All other issues are immaterial, except as they bear upon the vital issue. After denying the ownership of said mines by the Grand Central Mining Company and alleging that the Chief Consolidated Mining Company purchased the same in 1922, defendants then allege that after said purchase the Chief Consolidated Mining Company consolidated said mines with other mines belonging to it, and thereafter operated them all as one mine. De-

fendants admit that large quantities of ore were extracted from said mines so consolidated during the years in question, but allege that the net proceeds of the ore extracted from that portion within the limits of Mammoth City was less in value than the sum of $135,000. After alleging the manner of operating the mines, as above stated, it is then alleged that the defendant board did assess the mining property in question for the years 1923 and 1924.

It thus appears that the answer of defendants amounts to only a qualified denial that no assessment was made, and, as qualified, in our opinion, as matter of law it amounts to no denial at all. The whole question depends upon what constitutes a mine. If a taxpayer has a right to take any number of separate and distinct mines, subject to taxation under the Constitution and laws of the state, and group them together and call them one mine for purposes of taxation, it is easy to see how the taxing units in which the mines are situated may, at the whim or caprice of the mine owner, be annually deprived of the revenue to which they are entitled. If by so grouping their mines the proceeds from the productive mines can be applied to the development of those which are unproductive, or partially so, it seems to us that one of the most vital purposes of the statute may thereby be defeated. The first important question therefore is, Was the Grand Central mine, which is admitted to be in Mammoth City, in 1923 and 1924, a mine within the contemplation of the statute quoted in the opinion? If it was a separate and distinct mine and subject to taxation in 1922, when it was purchased by the Chief Consolidated Mining Company, our contention is that it did not lose its character as such by being grouped with other mines for the mere convenience of the owner or for the purpose of escaping taxation. The answer admits the existence of the Grand Central as a separate mining claim at the time it was purchased and alleges its consolidation with other mining claims. The most significant admission, however, is that made by the Attorney General in his brief filed in the

case. He represents the defendant board, and the board is therefore bound by his admissions. We quote from the first page of his brief the following language:

"Prior to November 10, 1922, Grand Central Mining Company owned the mining claims particularly described in paragraph 5 of the affidavit of plaintiff. These claims are situated within the limits of Mammoth City. Within these mining claims the Grand Central Company had developed a mine, and as the owner and operator of this mine it had made the annual return to the state board of equalization for assessment purposes. The state board of equalization made the assessment and returned the same to the board of county commissioners of Juab county, and the assessment was by that body alloted to the Mammoth City taxing unit."

It thus appears that the Grand Central mine, located in Mammoth City, prior to 1923 was a recognized mine, taxed as such, and the revenue derived therefrom, for city purposes, was paid to Mammoth City. The opinion of the court expressly declines to define a mine for taxing purposes, yet, as we understand the logic of the opinion, it leads to the inevitable conclusion that distinct and separate mines, taxable, as such, may be consolidated and operated as one mine and thereby become taxable only as such. However, in our opinion, in the instant case it is not of vital importance, for it must be conceded from every rational point of view that the Grand Central mine is a mine and has been so considered and treated by the taxing authorities of the state. One thing is manifest—if the Grand Central is not a distinct mine for taxing purposes, then it is absolutely necessary in the case at bar to determine what a mine is in order to justly and intelligently decide the issues involved. The opinion seems to proceed on the theory that the grouping and consolidating of several distinct mines by the owner for working purposes converts the several mines into one for taxation purposes, for the opinion stresses the point that plaintiff made no denial thereof, and therefore treats it as an admitted fact. Our contention is that such grouping and consolidation of distinct mines do not, as matter of law,

convert them into one mine for taxing purposes, and therefore it was not incumbent upon plaintiff to deny the fact. If plaintiff in its application for the writ had expressly alleged that the mining company had grouped and consolidated its mines and was working them as one mine and was assuming that it was one mine for taxing purposes, would the application have been demurrable on that ground? Certainly not, unless such grouping and working constituted a single mine in contemplation of the statutes quoted. It is a question of law pure and simple under the issues of this case and not an issuable fact. If in the opinion of the court it is an issuable fact, then its position must be, as before stated, that the grouping and consolidating of several mines and working them as one constitutes only one mine for taxing purposes. If that is the opinion of our associates they ought to have so stated in their opinion instead of declining to state what constitutes a mine.

Assuming, as we do, that the Grand Central mine situated in Mammoth City is a mine for taxing purposes in contemplation of the statutes quoted, the question is, Was the Grand Central mine assessed for taxation in 1923 and 1924? The statute, section 5929, quoted in the opinion, provides that every person engaged in mining, etc., must each year make out a statement of the gross yield of the metals or minerals from each mine worked or owned by such person during the year next preceding the 1st day of January, and its value, which statement shall show the net proceeds thereof. We have stated the substance of the section only in so far as it is material here. The sole purpose of this section is to advise the board of equalization so that it may make a proper assessment of each mine. Section 5932 then provides, in substance, that the board of equalization, prior to the first Monday in May of each year, must assess the mines and mining claims, etc., and before the third Monday in June apportion the same to the several counties in which the mines are situated. The board must prepare a book called the "Assessment Book of Mines," in which must be entered the

assessment of all mines subject to assessment, and in which must be specified in separate columns and under appropriate heads: (1) Owner of mine; (2) name and description and location of mine; (3) county in which it is situated; (4) net proceeds in dollars if a metalliferous mine; (5) value of the mine, etc.

As we understand the statutes, such record constitutes an assessment of a mine in this state. The application filed by plaintiff in this case alleged that there had been no assessment of the Grand Central mine for the years 1923 and 1924. This court deemed the application sufficient to invoke the power and jurisdiction of the court, and it issued an alternative writ thereon directed to the defendant board, reciting the allegations of the application, alleging that no assessment of said mine had been made, and required the board to forthwith make the assessment as required by law or appear on a certain date and show cause why it had not done so. The board made answer and attached thereto its so-called record of assessment of said mine. Nowhere in the record does the name of the Grand Central mine appear. There is no description thereof, nor is the location given. The net proceeds of the Grand Central mine situated in Mammoth City is not stated, nor is the value of the mine given. Every possible requisite of a valid assessment under the statute, except the name of the owner and the county, is omitted, and the consequence is that Mammoth City was wholly deprived of the revenue to which it was justly entitled. Had the assessment been made as provided by law, even in substance, such injustice would not have occurred. If the Grand Central mine had even been named, to say nothing about the description or location thereof, as the statute requires, the injustice complained of would not have happened, because the mine by its name was evidently so well known that the board of commissioners of Juab county could readily have apportioned the tax. The only pretended assessment by the board was to name the owner and the county and state the net proceeds of its mining properties

in Juab county, with the values of said properties. If the county collector of Juab county had undertaken to enforce payment of the taxes due Mammoth City for the years in question, upon what property could he have levied? Upon what property did Mammoth City have a lien for taxes? This is one of the tests for a proper assessment of land, and the Grand Central mine is land.

Before referring to authorities as to what constitutes a valid assessment, we will make one or two observations concerning some matters referred to in the opinion of the court. It is said that the answer of defendants alleged that the taxes on the net proceeds for the years in question have been paid and that that allegation has not been denied. This is somewhat analogous to the question we have already reviewed relating to the grouping of the mines and operating them as one mine. It is a question of law and not an issuable fact. If the Grand Central mine has not been assessed at all it is no defense, as matter of law, that the taxes have been paid, especially if they were not paid to Mammoth City. If the mine was not assessed at all, as we contend, certainly the payment of taxes thereon to some other taxing unit not entitled thereto is no defense as against Mammoth City, either in law or in equity. It is not claimed in the answer or in the opinion of the court that Mammoth City was paid any taxes whatever for the years in question, and it is alleged in the application and admitted in defendants' brief that the Mammoth City taxes were not paid. Furthermore in this connection, even if it be assumed that the mining company, in good faith believing it had been assessed, paid the taxes on the Grand Central mine to some other taxing unit, still the bald fact remains that the mining company has not paid all the taxes it should have paid for the years in question. If the mining company be credited with taxes paid to some other taxing unit which ought to have been paid to Mammoth City, there is nevertheless a sum exceeding $3,000 due to Mammoth City, which the mining company has not paid at all, and which has entirely escaped taxation

as far as Mammoth City is concerned, because of the fact that there was no assessment of the Grand Central mine.

Viewing the case from every possible angle, it cannot be contended that Mammoth City has no just cause for complaint.

Reverting now to the question, Was the Grand Central mine assessed as provided by law? We have shown that not a single requirement of the statute, except the name of the owner and the county in which the mine is located, was observed by the board in its pretended assessment.

In Cooley on Taxation (3d Ed.) vol. 1, p. 598, it is said:

"The assessment being so important, the statutory provisions respecting its preparation and contents ought to be observed with particularity."

In Brown on Assessment and Taxation, at page 68, it is said:

"An accurate description of the land assessed is essential to the validity of the assessment and without certainty in that respect no foundation is offered for future action."

The text refers to In re N. Y. C. & H. R. Co., 90 N. Y. 342. In that case there was some attempt to describe the land, but it was held that the assessment was invalid.

In 26 R. C. L. at page 314, the rule is thus stated:

"A sufficient description of the property intended to be assessed is inherently essential to a valid tax on real estate, and if the property is not described in the assessment list with sufficient accuracy and particularity to render it capable of ready identification the tax thereon is void."

Again, it is said in the same section:

"If the statute imposes special requirements in regard to description, these are mandatory and must be complied with, and a description will not be sufficient to sustain a tax even if it is sufficient readily to identify the land and would be adequate in a deed if it is not in compliance with the statute."

We are not contending for any such stringent rule in the case at bar. It undoubtedly applies in cases where parties are claiming under tax sales. What we do contend, however, is that where property has not been assessed at all, or assessed so inadequately as to permit of property escaping taxation, then the public and every taxpayer of the taxing unit is interested just as much as is the taxpayer who is complaining of a void assessment. In such cases the law requiring a proper assessment is mandatory, and a writ of mandate will lie to enforce it.

In Cooley on Taxation, supra, at pages 1357, 1358, in speaking of the writ of mandate, the author says:

"It will lie to compel an assessor to assess lots separately as required by the statute; to compel the assessment as town lots and not as farming lands of land which has been laid out into lots and to correct clerical errors in the assessment rolls while yet they are in the assessor's hands. *If the assessors omit from the roll property which is taxable, they may be compelled to insert it on the roll on the application of the proper law officer of the state."* (Italics ours.)

The cases cited in the note support the text. Even a taxpayer may apply for the writ where taxable property is omitted from the roll. See, also, *People v. Purviance,* 12 Ill. App. 216; *State v. Bartholomew,* 103 Conn. 607, 132 A. 30, and *State ex rel. Wayne County Court v. Herrald, Commissioner,* 36 W. Va. 721, 15 S. E. 974. The last case cited and cases referred to in the opinion are especially illuminating on the question as to who may apply for the writ and when it may be applied for.

In Dillon, Municipal Corporations (5th Ed.) p. 2657, the correct rule is stated, and was quoted in the original opinion in this case, as follows:

"If the inferior tribunal, corporate body, or public agent or officer has a discretion, and acts and exercises it, this discretion cannot be controlled by mandamus. But if the inferior tribunal, body, officers, or agents refuse to act in cases where the law requires them to act,

and the party has no other legal remedy, and where, in justice there ought to be one, a mandamus will lie to set them in motion, to compel action; and, in proper cases, the court will settle the legal principles which should govern, but without controlling the discretion of the subordinate jurisdiction, body, or officer."

The taxpayer in such cases is certainly injured in that he is compelled to bear an unequal burden.

Some contention has been made, if not in the opinion of the court at least in our discussion of the issues, that plaintiff in this case has not proved that the Grand Central mine was not assessed. That contention presents the question as to what character of evidence is admissible to prove whether or not there has been an assessment of land. Our position is that the assessment roll, or the record of assessment, is the only evidence admissible unless the record has been lost or destroyed.

Cooley on Taxation (3rd Ed.) vol. 1, p. 601, in one brief sentence states the rule:

"An assessment of land cannot rest in parol, for a definite record evidencing official action is essential."

For brevity we quote the following from 45 Century Digest, Col. 834 § 514:

"The record of taxes, so long as it exists, is the best and only evidence of taxation. *Pittsfield* v. *Barnstead*, 38 N. H. 115; *Farrar* v. *Fessenden*, 39 N. H. 268.

"The proper way to show whether land was taxed to a party or not is by the records. *Forest* v. *Jackson*, 56 N. H. 357.

"Where the office of the clerk of the county court had been burnt, and the records destroyed, and it was proposed to establish the assessment of a particular lot for a certain year, the sheriff was offered to prove that he had seen either the original tax list in the clerk's office, or in his predecessor's hands an authenticated copy of the tax list, on which the sheriff collects the taxes and to show its contents. Held, that as it did not appear that the list was either lost or destroyed his testimony as to its contents was inadmissible.

"A deed from the commissioners for land sold for the nonpayment of taxes is inadmissible to prove that the taxes had been assessed on

the land and paid by certain parties, since such facts are capable of better proof by the duplicates and the treasurer's books. *Simon's Lessee* v. *Brown*, 3 Yeates (Pa.) 186, 2 Am. Dec. 368.

"A book, alleged to contain an assessment on unseated lands, found in an office occupied by the commissioners and treasurer, which does not express that it is the unseated land book of the county, nor that it is a transcript of the unseated lands furnished by the commissioners to the treasurer, and which is without evidence as to its identity, is not evidence of an assessment. *McReynolds* v. *Longenberger*, 57 Pa. 13.

"The only proper proof of assessment of property for taxation is the production of the assessment, or duplicates from the commissioner's office. *Stark* v. *Shupp*, 112 Pa. 395, 3 A. 864.

"Assessment rolls are themselves the best evidence of their contents, and they cannot be proven by the evidence of a city official. *City of Seattle* v. *Parker*, 13 Wash. 450, 43 P. 369."

We have verified the quotations by an examination of the cases.

This rule, as we read the authorities, is not disputed by any well-considered case; hence, we do not understand what is meant by the contention that plaintiff failed to prove the Grand Central mine was not assessed. When the board of equalization, in response to the writ, brought into court the only evidence admissible to prove whether or not the mine had been assessed and thereby failed to show that it had been assessed, it seems to us the plaintiff's case was fully proven and in the only way it could be proven, especially as no claim was made that any of the records were lost or destroyed. Conceding, as contended, that the burden was on the plaintiff to prove that the mine had not been assessed, it fully discharged that burden by the record made and produced by the board. What other evidence that would have been admissible could plaintiff have offered to prove that the Grand Central mine had not been assessed? The rules of evidence relating to documentary evidence applies to this case. The writing itself is the best evidence, and no other is admissible unless it appears that the writing has been lost or destroyed. If it be contended that it does not appear that all the records of the assessment of mines for the years

in question were produced, the answer is that the Attorney General, in open court in response to a question by the Chief Justice, stated that all the records were before the court. This was verified by the secretary of the board, who happened to be present in court.

While we do not agree with the contentions made by the Attorney General and his associates in the case in their discussion of the issues presented, we do, however, commend them for their frank admissions on two or more important questions which tend to clarify the record. In addition to the admission already referred to and quoted wherein they admit that the Grand Central mine when purchased by the Chief Consolidated Mining Company was a mine and had been assessed as such and the taxes thereon paid to Mammoth City, they also admit in the same brief that Mammoth City during the years in question did not receive its taxes on the net proceeds of the Grand Central mine. We contend, as before stated, that the sole reason why Mammoth City received no taxes on the net proceeds of the mine is because the net proceeds of the mine were not assessed. Counsel for defendants, and also the court in its opinion, refer to one record before the court in which it appears that the name of the Grand Central mine is mentioned. The caption of the record referred to reads as follows: "Record of assessment for the year 1924 upon the property of the Chief Consolidated Mining Company, Grand Central mine, Mammoth," etc. This record is relied on as evidence of the fact that the Grand Central mine was not overlooked in the assessment. To our minds this record but emphasizes the fact that the net proceeds of the mine were not assessed, for the body of the instrument when examined merely shows an assessment of the personal property of the mine, such as machinery, tools, and various kinds of mining equipment. These were properly assessed. The mine was named, located, and described, but the net proceeds of the mine were not assessed. What may we infer from this record? (1) That the Grand Central mine was by the record recognized as a

mine; (2) that when the board of county commissioners of Juab county saw the record, which it must have done, and saw that the personal property of the Grand Central mine had been assessed, but not the net proceeds, it could well have concluded that the mine had produced no net proceeds for the year in question, otherwise, they too would have been assessed. In that respect the record was worse than no record at all, for if the mine was assessed, as contended by defendants, the record was absolutely misleading and calculated to produce the very wrong of which plaintiff complains.

Much is said in the brief of counsel for defendants and in the opinion of the court as to the fault of the board of commissioners of Juab county in failing to apportion the taxes among the taxing units of the county. The blame is laid at the door of the commissioners instead of the state board of equalization, whose failure to make the assessment as required by the statutes is the foundation of the whole trouble. The statute requires the state board of equalization to so assess the property that nothing is left for the county commissioners but to apportion the taxes among the taxing units of the county. It requires the state board to not only name the owner of the mine and a description thereof together with the county in which it is situated, but in addition thereto it requires said board to name the location of the property. The word "location" does not refer to the county, because the name of the county is also required. The principal if not the only reason for requiring the location of the mine to be given as well as the name of the county is to determine the local units in the county among which the taxes are to be apportioned. The state board is expressly given by statute full power to ascertain every fact requisite to make an assessment. If the mining company will not furnish the information the board can obtain it from any other available source. The board of county commissioners is not so expressly empowered, nor is there any reason why it should be if the state board of equalization would perform its duty

as the law requires. In our opinion the word "location" used in the statute refers to the taxing units within the county and cannot logically refer to anything else. Why, then, criticize the board of county commissioners, who are not parties to this proceeding, instead of putting the blame where it actually belongs?

It is said in substance in the opinion of the court that to require an assessment now to be made segregating the proceeds of the mine would be of no avail to plaintiff, because "the tax thereon admittedly has been paid." We know of no such admission as far as taxes due Mammoth City are concerned. On the contrary, as we have shown, it is admitted in defendants' brief that the taxes due Mammoth City have not been paid. The error into which the majority of the court has fallen is grounded upon the fallacious assumption that plaintiff is asking for judgment on the pleadings. The defendants themselves made no such contention, nor did their counsel during the argument. Plaintiff is asking for judgment on the records produced and solemn admissions made by defendants in open court and in briefs filed in the case. Again, it is said in the court's opinion, "Surely the company may not then be penalized and subjected to double taxation." Then follows language which goes a long way towards deciding in advance that Mammoth City would not have a cause of action of any kind against the county or any other taxing district in the county which had received taxes to which Mammoth City may be entitled. The majority may be right upon that question. We neither admit or deny. But is it proper to decide that question now? If Mammoth City can get no relief in this form of action is it right to decide in advance that it can get no relief in *any* form of action? As that question is not before the court, we think it should be reserved. Neither is the question of double taxation before the court. Double taxation is repugnant to the feelings and sensibilities of every just-minded man, whether he is the victim of it or not. But Mammoth City has received no taxes whatever on the net proceeds of the

mine. It is not asking for double taxation. If the mine is assessed as the law provides Mammoth City can at least get partial relief without penalizing the mining company or subjecting it to double taxation. If the question of double taxation arises by reason of a proper assessment, that question can be adjusted according to equity in some other proceeding. The case of *Shackelford v. McGlashan*, 27 N. M. 454, 202 P. 690, 23 A. L. R. 75, cited and relied on in the prevailing opinion, illustrates our views of the law in this connection. In that case the property was misdescribed in the assessment, but the owner paid the tax believing he was paying it on the land assessed. A reassessment was made in which the land was properly described. Upon that assessment the tax was not paid and the land was sold for the nonpayment thereof. In an equitable proceeding instituted by the owner of the land the tax deed was canceled.

While this is not a case of double taxation the same equitable principle is involved. The distinction between that case and the case at bar is manifestly clear. In that case the owner of the land paid all the taxes levied on the property. In this case the tax levied by Mammoth City has not been paid, and to that extent the mining company has escaped taxation.

We are not disposed to indulge in drastic criticism or condemnation of the owners of the Grand Central mine. That company is not before the court as a party, but strong pleas have been made in its behalf and apprehension of double taxation is strongly stressed, both in defendants' brief and in the prevailing opinion. As to this it is only necessary to state that the hands of the mining company are not entirely clean. It has not paid Mammoth City any taxes on the net proceeds of its mine in that city either for the year 1923 or 1924. It knew that taxes had been levied by Mammoth City on all the taxable property within the city in 1924; it knows that the taxes have not been paid to Mammoth City, and that Mammoth City has been wholly

deprived thereof; it knows that at least a portion of the taxes levied on its property in Mammoth City has not been paid to Mammoth City or to any taxing district in Juab county or anywhere else in the state. It therefore knows that a part of its property in Mammoth City has entirely escaped taxation. So that the plea of double taxation, by whomsoever made, has no place in this proceeding.

It has also been stated that the mining company made its return to the state board of equalization on blank forms furnished by the board and that therefore it is not to blame. In answer to this it may be said that the blanks furnished by the board were ample for the purpose of substantially complying with the statute, if the proper return had been made by the company. This was demonstrated in the assessment made on the personal property connected with the Grand Central mine in 1924. In that assessment the name of the mine was stated together with name of the owner. The location was given as Mammoth City, and the property to be assessed was minutely described and its value stated. Upon that return the state board of equalization could make and did make an assessment in strict compliance with every requirement of the statute. The question arises, Why did not the mining company make return of the net proceeds of the Grand Central mine in the same manner? It could have done so on exactly the same kind of form, at least as far as the name of the owner, name of the mine, location, net proceeds, and value were concerned. An assessment made on such return would have been a substantial compliance with the statute and all that could be demanded in cases of this kind. So that there is nothing in that point in favor of the company in any manner tending to show its good faith or excusing its failure to make a proper return. But after all the delinquency of the mining company affords no excuse to the defendants for failing to make a proper assessment—an assessment which would not result in injury or hardship either to the taxpayer or to the taxing district. Let it be understood that the members of the court subscrib-

ing to this opinion do not charge the defendants with willful and intentional wrong. The most that can be said in that respect is that the defendants suffered themselves to be misled by the returns of the mining company, which may or may not have been prompted by gainful motives. One thing is absolutely certain—the mining company did profit financially by the so-called assessment made on the returns of the mining company, which returns were palpably insufficient.

Before concluding our opinion we make the further observation that even if we concede, which we do not, that several distinct and separate mines may be consolidated and operated as one mine and assessed as one mine, it is indisputably essential, where they are located in two or more separate taxing districts, to so assess the mine that the net proceeds in each district may be separately taxed. As stated by the Chief Justice in the original opinion in this case and approved by a majority of the court:

"If one mine is located in two separate taxing units it would be the duty of the taxing authorities, so far as they might, to separate the net proceeds taken from the mine in the different taxing units. In no other way can the provisions of section 10 of article 13 of the Constitution be given effect. Said section is as follows: 'All corporations or persons in this state or doing business herein shall be subject to taxation for state, county, school, municipal and other purposes, on the real and personal property in or used by them within the territorial limits of the authority levying the tax.'"

So that whatever may be the ultimate conclusion as to what constitutes a mine for taxing purposes, it ought to be conceded that the Grand Central mine was not assessed in 1924, and that the pretended assessment relied on by defendants is void as far as the rights of Mammoth City are concerned.

The following cases decided by this court are cited and relied on by the defendants and in the prevailing opinion: *Juab County v. Bailey*, 44 Utah, 377, 140 P. 764; *Rich*

*County v. Bailey,* 47 Utah, 378, 154 P. 773; *Ririe v. Randolph,* 51 Utah, 274, 169 P. 941. The same cases were cited and relied on at the original hearing of the case. In disposing of these cases in the original opinion it is said by the court:

"The court in those cases was dealing with assessments regularly made. The application for the writs were made subsequent to the dates upon which the county commissioners were required to have apportioned the property assessed to the taxing units. In the instant case it does not appear that the property has ever been assessed. If the record of the defendant board anywhere disclosed that the property mentioned in the affidavit had been assessed the rule stated in the cited cases would be conclusive against granting the writ."

That was a complete answer to the cases cited when the original opinion was written. We think it is a complete answer now. Section 5908, quoted in the prevailing opinion, provides that "any property discovered by the assessor to have escaped assessment may be assessed at any time," etc.

In 26 R. C. L. at page 351, it is said:

"Taxes are not canceled and discharged by the failure of duty on the part of any tribunal or officer, legislative or administrative. Payment alone discharges the obligation, and until payment the state may proceed by all proper means to compel the performance of the obligation. No statutes of limitation run against the state, and it is a matter of discretion with it to determine how far into the past it will reach to compel performance of this obligation."

The Grand Central mine, as we contend, was not assessed at all in 1924, and that is the distinction between the cases referred to and the case at bar.

From whatever standpoint we view this case, simple justice, under the law, demands that the writ prayed for by the plaintiff should be granted.