PLUTUS MIN. CO. et al v. ORME et al., County Com'rs.

Nos. 4817, 4818. Decided January 16, 1930. (289 P. 132.)
Rehearing Denied June 19, 1930.

288

*Will L. Hoyt,* of Nephi, and *Robinson & Robinson,* of Provo, for appellants.

*Cheney, Jensen & Marr,* of Salt Lake City, and *Claude F. Baker,* of Eureka, for respondents.

ELIAS HANSEN, J.

On August 15, 1925, the district court of Juab county entered a decree segregating from Mammoth City certain lands owned in severalty by the Plutus Mining Company and the Los Angeles & Salt Lake Railroad Company. The decree of segregation was so entered after a petition had been filed and proceedings had pursuant to the provisions of Comp. Laws Utah 1917, title 16, chap. 21. Immediately after the decree of segregation was entered, certified copies thereof, together with plats showing the area segregated, were filed with the county recorder of Juab county, Utah, and with the secretary of state of the state of Utah. On February 3, 1926, Mammoth City appealed from the decree of segrega-

tion entered by the district court to this court. On January 23, 1928, the decree of segregation was in part reversed, and the district court was directed to recast its findings of fact and decree to conform to the views expressed by this court. *In re Chief Consol. Mining Co.*, 266 P. 1044. On May 8, 1928, a rehearing of the segregation suit was denied by this court. On June 1, 1928, the findings and decree of segregation were amended by the district court to conform to the decision of this court.

On August 25, 1926, the Plutus Mining Company and the Los Angeles & Salt Lake Railroad Company applied to the district court of Juab county for a writ of prohibition directing that the defendants W. G. Orme, Steele Bailey, and John Bunnell, as county commissioners of Juab county, Utah, be restrained from proceedings to reapportion to Mammoth City the valuations for the year 1926 on the property which was segregated from Mammoth City. The district court of Juab county granted the writ. The defendants filed a motion to dismiss the writ. The motion was denied. No further proceedings seem to have been had in relation to the writ of prohibition issued by the district court until after this court reversed the decree of segregation. On June 16, 1928, the defendants again moved the court for an order revoking and annulling the writ of prohibition issued on August 26, 1926. The motion was denied. Upon motion of plaintiffs judgment was entered "directing the board of County Commissioners of Juab County, Utah, to desist and refrain from all further proceedings in respect to the reapportionment to Mammoth City of valuations" on the segregated areas for the year 1926.

On July 15, 1928, the Plutus Mining Company filed a petition in the district court of Juab county, Utah, wherein it asked for a writ of prohibition directing that W. G. Orme, Earl Dunn, and John Bunnell, as county commissioners of Juab county, Utah, be restrained and prohibited from proceeding to reapportion to Mammoth City the valuations for the years 1927 and 1928 on the property which had been

segregated from Mammoth City by the decree of August 15, 1925. The petition of the Plutus Mining Company for a writ of prohibition sets out the various proceedings had in the segregation suit. The board of county commissioners demurred to plaintiffs' petition on the ground and for the claimed reason that the petition failed to state facts sufficient to constitute a cause for relief. The demurrer was overruled. The board of county commissioners refused to further plead, whereupon the district court of Juab county entered judgment directing that "the board of County Commissioners of Juab County desist and refrain from all further proceedings in respect to the reapportionment to Mammoth City for valuation on said segregated areas" for the years 1927 and 1928. The defendants prosecute this appeal from both of the judgments directing that the county commissioners of Juab county, Utah, desist and refrain from reapportioning to Mammoth City the valuations on the area segregated.

The appellants assail the judgments upon two grounds: (1) That the district court was without jurisdiction to render the judgments; and (2) that when the decree of segregation rendered by the district court was reversed by this court Mammoth City was entitled to collect the taxes on the segregated areas for the years 1926, 1927, and 1928 because the area had always been within Mammoth City.

We are of the opinion that there is no merit to appellants' contention that the district court of Juab county was without jurisdiction to hear and determine the controversy that existed between the appellants and respondents with respect to the claimed right of Mammoth City to have the segregated area pay city taxes for the years 1926, 1927, and 1928. District courts are courts of general jurisdiction and have power to issue writs of prohibition. Constitution of Utah, art. 8, § 7. Appellants contend that during the time the segregation suit was pending on appeal the district court was without jurisdiction to render any order or judgment prohibiting the board of county commissioners

of Juab county from reapportioning to Mammoth City the valuations on the segregated property because this court had exclusive jurisdiction of the cause. It was not, however, until after this court remanded the segregation suit to the district court that the writ of prohibition as to the reapportionment of valuations on the disputed area for the years 1927 and 1928 was applied for and granted. Obviously after the remittitur in the segregation suit had gone down to the district court it cannot be said that this court had exclusive jurisdiction to issue a writ of prohibition in the cause. The writ of prohibition as to the reapportionment of valuation on the segregated area for the year 1926 was not made permanent until after this court had disposed of the segregation suit. Moreover, the question of the right of the board of county commissioners of Juab county to reapportion to Mammoth City valuations on the segregated area during the interim between the date of the entry of the decree of segregation by the district court and the reversal of such decree by this court was not an issue, was not argued, and was not decided in the segregation suit. The district court had jurisdiction of the parties and of the subject-matter involved in this proceeding.

The sole question of merit presented by this appeal is whether or not Mammoth City is entitled to recover taxes on the area which was segregated from Mammoth City by the decree of the district court during the interim between the entry of such decree on August 15, 1925, and the reversal of such decree by this court in 1928. The solution of that question is dependent upon whether the area upon which it is sought to collect the taxes was within or without the corporate limits of Mammoth City during such interim. If the property sought to be held for the taxes for the years 1926, 1927, and 1928 was not segregated from Mammoth City by the decree of the district court, then there seems to be no legal reason why Mammoth City is not entitled to the taxes claimed for it. On the contrary, if the area sought to be held for taxes was not with-

in Mammoth City during the interim between the entry of the district court's decree of segregation and the reversal of such decree by this court, then, and in such case, Mammoth City is not entitled to the taxes claimed for it. Consituation of Utah, art. 13, § 10; *Gillmor* v. *Dale*, 27 Utah 372, 75 P. 932; *Murdock* v. *Murdock*, 38 Utah 373, 113 P. 330; *Parry* v. *Bonneville Irrigation District* (Utah) 263 P. 751.

In the consideration of the question here presented for review it is well to keep in mind that the creation of a city and the fixing of its territorial limits is essentially a legislative and not a judicial function. 1 McQuillan, Municipal Corporations, § 121, p. 294; 1 Dillon, Municipal Corporations (5th Ed.) § 353, p. 613; *Kimball* v. *Grantsville City*, 19 Utah 368, 57 P. 1, 45 L. R. A. 628.

Article 11, § 5, of the Constitution of Utah, provides:

"Corporations for municipal purposes shall not be created by special laws; the Legislature, by general laws, shall provide for the incorporation, organization, and classification of cities and towns in proportion to population; which laws may be altered, amended or repealed."

Pursuant to the foregoing constitutional provision, the Legislature of Utah has made provision for the restriction of the corporate limits of a city when justice and equity require it. The district court of the county wherein is situated the city to be affected by the proposed segregation is empowered to hear and determine whether or not the facts in a given case are such as to warrant the proposed segregation. Comp. Laws Utah 1917, title 16, chap. 21, p. 256. While some courts of high standing have held that the Legislature may not delegate its authority to restrict the corporate limits of a city to the judiciary, the contrary view has become the established law in this jurisdiction. *Young et al.* v. *Salt Lake City*, 24 Utah 321, 67 P. 1066. In view of the fact, however, that the changing of the territorial limits of a city is primarily a

legislative function, courts are bound to confine the exercise of the power conferred upon them by the Legislature within the expressed or necessarily implied language of the act so conferring such power. When a court shall have exercised the authority so granted by the Legislature and shall have rendered a decree of segregation, it is within the province of the Legislature and not the courts to say when such decree shall take effect. Comp. Laws Utah 1917, title 16, chap. 21, p. 257, provides:

> Sec. 775. "Upon the entering of a decree detaching said territory, or any part thereof, the clerk shall file a certified copy of the same and of the plat, in the office of the recorder of the county and in the office of the secretary of state; and when so filed, the severance shall be complete."

It is the contention of appellants that when the Legislature directed that the severance of territory should be complete when a decree was entered and certified copies thereof recorded in the office of the county recorder and of the secretary of state, a valid decree was meant; a decree which if appealed from would not be reversed by an appellate court. On the contrary, respondents contend that a decree of segreation entered and recorded as provided by law is self-executing and becomes at once a valid executed decree. That the decree of segregation entered by the district court is valid until reversed by this court is not open to controversy. In the segregation suit the district court had jurisdiction of the parties and of the subject-matter. It followed the procedure prescribed by law and determined the issues presented by the pleadings. The mere fact that a court may be in error as to the law or the facts does not invalidate a decree or judgment until it is reversed by an appellate court. 33 C. J. §§ 20 and 39, pp. 1064-1078. To hold that the decree of the district court of Juab county segregating the area here involved from Mammoth City had no valid existence between the date of its entry and recordation as provided by law and

the reversal of such decree by this court cannot be successfully maintained.

Is the language of section 775, supra, open to the construction that only decrees that are not reversed are included within its meaning? As bearing upon what decrees the Legislature had in mind when it provided for the time when a severance of territory from a city is complete, it is worthy of note that in the law providing for the procedure necessary to effect a severance of the territory from a city no mention or provision is made for an appeal from the decree of the district court. The right of a party to a segregation suit to appeal to this court must come from the provisions of our Constitution or statutes other than that dealing with the question of the segregation of territory from a city. It seems clear that when it was provided that the severance of territory from a city should be complete when a decree was entered and certified copies thereof together with plats recorded as in the act provided, the Legislature had in mind all decrees entered by the district court, without regard to whether an appeal would or would not be taken from such decrees. There can be no doubt but that when the Legislature provided for the time when the severance of territory from a city should be complete, it had in mind the probability that appeals would be taken to this court from decrees segregating territory from cities. It is equally probable that the Legislature was mindful that decrees of segregation entered by district courts might be reversed by this court. When the Legislature fixed the time and circumstances under which severance of territory from a city should be complete, no exception was made to those cases that should be reversed by this court. For us to say that the provisions of section 775, Comp. Laws Utah 1917, do not apply to decrees of segregation that are reversed by this court because of mere error, would be to read into the statute a meaning that is not justified by the language used.

It is further urged on behalf of the appellants that the

appeal from the district court's decree of segregation prevented the decree from taking effect. Here, again, the provisions of section 775, Comp. Laws Utah 1917, present an insurmountable difficulty to appellants' contention. When the Legislature has enacted a law which in plain unambiguous language says that a severance of territory shall be complete when the decree is entered and certified copies thereof together with plats recorded in the office of the county recorder and of the secretary of state, the courts are not authorized in holding that under such circumstances the severance is not complete. Webster's New International Dictionary defines "complete" as meaning "with no part, item, or element gone, free from deficiency, entire, perfect, consummate." A severance of territory from a city cannot be free from deficiency, entire, complete, perfect, or consummate if the severance is held in abeyance pending the result of further litigation. On this appeal we are not called upon to determine whether or not the district court could have stayed the execution of the decree of segregation by directing that the recordation of the decree be withheld until the appeal was disposed of. Such a state of facts is not presented by the record on this appeal. It may be that the district court or this court could have directed the clerk to withhold the recordation of the decree pending the appeal. *Dulin* v. *Pacific Wood & Coal Co.*, 98 Cal. 304, 33 P. 123. The city did nothing for nearly six months after the decree of segregation was entered and recorded to indicate that it was dissatisfied with the decree or to prevent the segregation of the territory from becoming complete and the decree of segregation from becoming executed. The petitions for the writs of prohibition allege that the decree of segregation was entered and that certified copies thereof, together with plats showing the severed territory, were recorded during the year 1925 in the office of the county recorder of Juab county and of the secretary of state. The demurrer admits such facts. It is not made to appear that Mammoth City, in the segregation suit, asked

for a stay of execution of the segregation or for an order of the district court withholding from recordation the decree of segregation. The appeal in the segregation suit was not taken until February 3, 1926. Obviously, from the date the decree of segregation was entered until the appeal was taken, the severance of the area in dispute was absolute, because there was nothing to prevent the decree from taking effect. The officers of Mammoth City could not hold the decree of segregation in abeyance for a period of nearly six months by entertaining a secret intention of appealing from the decree. If the severance of the area in dispute was complete from the date of the entry of the district court decree on August 15, 1925, until the date the appeal was taken on February 3, 1926, it must necessarily follow that the severance remained complete until the decree of segregation was reversed. The perfecting of an appeal cannot stay or undo the effect of a decree which is executed. Territory cannot be taken from without and placed within the corporate limits of a city by filing a notice of appeal.

Respondents in their brief call our attention to the following cases wherein a stay of execution pending an appeal cannot be had, where an executor or administrator is removed and a special administrator is appointed, where a license is revoked, where a bill is dismissed and an injunction discharged, and where rights are acquired under a judicial sale: *In re Crozier, Deceased,* 65 Cal. 332, 4 P. 109; *Merced Mining Co.* v. *Fremont,* 7 Cal. 132; *More* v. *Miller,* 6 Cal. Unrep. 78, 53 P. 1077; *More* v. *More,* 127 Cal. 460, 59 P. 823; *Ex parte O'Connell,* 75 Cal. App. 292, 242 P. 741; *Nill* v. *Comparet,* 16 Ind. 107, 79 Am. Dec. 411; *Bridges* v. *McAlister,* 106 Ky. 791, 51 S. W. 603, 45 L. R. A. 800, 90 Am. St. Rep. 267; *Fawcett* v. *Superior Court,* 15 Wash. 342, 46 P. 389, 55 Am. St. Rep. 894; *State* v. *Poindexter,* 43 Wash. 147, 86 P. 176; *Willard* v. *Ostrander,* 51 Kan. 481, 32 P. 1092, 37 Am. St. Rep. 294; *Merrimack River Sav. Bank* v. *City of Clay Center,* 219 U. S. 527, 31 S. Ct. 295,

55 L. Ed. 320, Ann. Cas. 1912A, 513; *In re Grant,* 44 Utah 386, 140 P. 226, Ann. Cas. 1917A, 1019; *Barnes* v. *Typographical Union,* 232 Ill. 402, 83 N. E. 932, 14 L. R. A. (N. S.) 1150, 122 Am. St. Rep. 129. Appellants contend that the facts in this case bring it within the rule that a judgment should not be permitted to stand if it is founded upon a judgment which has been reversed; that the judgments appealed from in this case are based upon the decree of segregation which was reversed. In support of such contention, the following cases and authorities are cited. Ann. Cas. 1913A, page 469; *Vallely* v. *Northern Fire & Marine Ins. Co.,* 254 U. S. 348, 41 S. Ct. 116, 65 L. Ed. 297; 7 R. C. L. 1031, § 59; *Quereau* v. *Railway Co.* (D. C.) 251 F. 986; *People* v. *Siman,* 284 Ill. 28, 119 N. E. 940; *Humphrey* v. *Employers' Liability Assurance Corp.,* 226 Mass. 143, 115 N. E. 253. None of the cases cited by the appellants or by the respondents deal with the effect of a decree which segregates territory from a city, and therefore we shall not undertake to review them.

Counsel stated at the time of the oral argument that they had been unable to find a case in point, and our search has likewise been without reward. The failure to find a case in point, however, should not be a serious embarrassment to the reaching of a proper conclusion in this case. Our duty is to ascertain from the language used by the Legislature its intention as to when and under what circumstances territory once within a city is to be regarded as severed therefrom. If the meaning of the language used by the Legislature in an act is clear and unambiguous, we are but required to give it effect. If the language of an act is open to construction, it then becomes our duty to inquire into the probable aim which the Legislature had in mind when it passed the act and the purpose which it desired to accomplish by the act. Among the aims and purposes of the Legislature when it enacted our laws relating to cities were that the boundary lines of cities be fixed with certainty and that the location of such bound-

aries be made known to the public. The petition for the incorporation of a city must be accompanied by an accurate map or plat of the territory proposed to be embraced within the proposed city. Before the incorporation is complete, certified copies of the map or plat must be filed in the office of the county recorder of the county wherein is situated the proposed city, and in the office of the secretary of state. Comp. Laws Utah 1917, §§ 520 and 522. When the corporate limits of a city are extended, a certified copy of an accurate map or plat showing the territory to be annexed must be recorded in the office of the county recorder of the proper county before the annexation is complete. Comp. Laws Utah 1917, § 770. And likewise it would seem that severance of territory from a city is not complete until a plat showing the property severed has been recorded in the office of the county recorder of the proper county, and in the office of the secretary of state. Comp. Laws Utah 1917, § 775. The requirements that the boundaries of a city be fixed, definite, and certain, so that all may know the exact limits of the territory embraced within a city, is necessary to the very existence of a city. "Unless the boundaries are described with certainty so that it is possible to determine the precise area intended to be included the incorporation will be void." 1 McQuillan, Mun. Corps. § 259, pp. 585, 586, and cases cited in the footnotes. To the same effect, see 1 Dillon, Mun. Corps. (5th Ed.) § 352, p. 611. If it be necessary to the valid existence of a city that its boundaries be made definite and certain at the time of incorporation, it woud seem to be no less important that such boundaries be kept certain and definite after the city is incorporated.

By legislative enactments cities are in a measure granted local self-government. As a general rule the powers of a city are coextensive with its corporate limits. A few illustrations will show the public necessity of keeping boundary lines of a city definite and certain at all times. A city is empowered to license and regulate various kinds of business

within its corporate limits. Outside of cities and towns the board of county commissioners are granted such power. If a person desired to conduct a business on the area here involved during the interim between the entry of the district court decree of segregation and the reversal of such decree by this court, to whom should such a person apply for a license—to the city or to the county authorities? There would be no way of finding out under the theory advanced by counsel for appellants until this court finally decided whether the decree of the district court should be affirmed or reversed. If in the meantime one engaged in business without a license from the proper authorities, is he liable to be fined or imprisoned or both for each day during the interim his house of business is open? If a city ordinance directs that he shall conduct his business in. one way, and a county ordinance requires that it be conducted in a different way, shall he obey the city ordinance, or shall he obey the ordinance enacted by the board of county commissioners? Obviously, if appellants' theory is the law, these questions must remain unanswered until there is a decision by a court of last resort.

The board of county commissioners are granted power "to make and enforce within the limits of the county, outside the limits of incorporated cities and towns, all such local police, sanitary and other regulations as are not in conflict with general laws." Cities are granted similar powers within their corporate limits. It frequently occurs that the regulations made by the county authorities differ from the regulations made by the city authorities. If a person had resided upon the segregated area during the interim between the entry of the district court's decree and its reversal by this court, should he comply with the county regulations or the regulations imposed by the city? If the theory of appellants to be adopted, he must choose at his peril.

If, as contended by appellants, the area in dispute was always a part of Mammoth City, it necessarily follows that the city had authority during the interim between the entry

of the district court's decree of segregation and its reversal by this court to enforce its sanitary, police, and other regulations within the segregated area. It may be enlightening to inquire how a city would proceed to enforce its sanitary, police, and other regulations on the area in dispute during such interim. An assumed concrete case may throw some light on what might be expected to occur as a result of the city's attempt to exercise its authority over the segregated area under a law such as appellants contend is the law. A is charged with having committed a misdemeanor contrary to and in violation of an ordinance of Mammoth City. He enters a plea of not guilty. He insists upon and is granted a speedy public trial by jury as guaranteed to him by our Constitution. The case proceeds to trial. In our supposed case we may assume that the facts are all agreed upon except the question of whether the charged offense was committed within or without the corporate limits of Mammoth City. Upon that issue we may further assume that the evidence shows without conflict that on August 15, 1925, the district court of Juab county entered a decree segregating from Mammoth City the territory upon which the alleged offense was committed; that certified copies of the decree together with a plat or map showing the area segregated were duly and regularly recorded in the office of the county recorder of Juab county and of the secretary of state of the state of Utah; that Mammoth City intends to, or has already appealed, as the case may be, to the Supreme Court of Utah from the decree of segregation. With this evidence in both sides rest, and it becomes the duty of the court to instruct the jury as to the law of the case. If appellants' theory be correct, it would be the duty of the court to inform the jury that if the Supreme Court of Utah affirms the district court's decree of segregation they should find the defendant not guilty, but on the contrary, if the jury should find beyond a reasonable doubt that it would finally be determined that the territory upon which the alleged offense was committed was erroneously segregated from

Mammoth City, then the jury should find A guilty of the offense charged. If the trial judge should decide that it is a question of law and not of fact as to whether the charged offense was committed within the city of Mammoth, then he, instead of the jury, would, according to appellants' theory of the law, be confronted with the unique task of determining in advance the decision that would finally be reached in the segregation suit. If the county should attempt to enforce its ordinances within the area in dispute, similar difficulties would be encountered.

Every registered elector who resides within the corporate limits of a city has the right to participate in the election of city officers. If an elector residing on the segregated area had applied at the polls in a city election held during the interim between the entry of the district court's decree of segregation and its reversal by this court, and had demanded the right to vote and his vote had been challenged, what would have been his legal status? If the law is as contended for by appellants, it would depend upon whether at some future time the district court's decree of segregation would be affirmed or reversed. If the prospective voter should receive such information, we may well imagine his perplexity as to whether he should or should not vote.

Cities are given authority to establish and maintain streets within their corporate limits. They are liable for injuries occasioned by their negligent failure to keep their streets in repair. The board of county commissioners has the supervision and control of streets and highways within the county outside of incorporated cities and towns. If territory is segregated from a city and later the decree of segregation is reversed, who is responsible for keeping the streets and bridges, if any, on the segregated area in repair during the interim between the entry and recordation of a segregation decree and its reversal by an appellate court? If appellants are right as to the law no one knows until the appeal has finally been disposed of. Under such a law the city, pending an appeal, would be confronted with this

dilemma: If it undertook to repair the streets or bridges in the territory which had been segregated from the city and the decree of segregation were later affirmed, the city would be without authority to pay for the repairs. If, on the contrary, the city failed to keep the streets and bridges in the segregated area in repair pending the appeal and a person be injured because of such neglect, then upon reversal of the decree of segregation the city would be liable to respond in damages. One might proceed indefinitely to give illustrations of the confusion that would follow in the wake of a law that fixes the boundary of a city not where the public records indicate such boundaries are located, but at a place to be determined at some future time. Further illustrations, however, would but emphasize the necessity for constant certainty in the corporate limits of a city. It cannot be that the Legislature intended that the authority and duties of city and county officers should be fixed, not upon what the public records show the facts to be, but upon what might finally be the result of a segregation suit. The orderly administration of government demands that the boundaries of cities be known, certain, and definite at all times. Any other rule leads to uncertainty, confusion, and conflict between city and county governments. The "no man's land" of the late world war has no place in local government.

If an adherence to the strict letter of a statute leads to an injustice, courts frequently restrict or enlarge the ordinary meaning of the words used in order to effectuate the intention and purposes of the lawmaking powers. Such rule, however, has no application in this case. The authority of a city to tax property is not a vested right. Unless prohibited by some constitutional provision, the Legislature may limit or even deprive cities of their power to tax. 1 McQuillan, Mun. Corps. § 165, pp. 378, 379. The authority of a city to tax property within its territorial limits is granted upon the theory that the taxes paid to a city are returned to the taxpayers of the city in

the form of benefits conferred upon the property paying the tax. If Mammoth City, during the interim between the entry of the district court's decree of segregation and its reversal by this court, had no legal right to confer municipal benefits upon the segregated area, it must follow that Mammoth City had no legal or equitable claim to collect any taxes upon the segregated area during such period. Mammoth City may have been financially benefited or financially injured by having the area segregated from its territorial limits. If the cost of giving police protection and other municipal benefits to the segregated area would have been greater than the taxes collected from such area during the years in question, the net result of having the disputed area out of the city would be an advantage to the city. The relative municipal benefits which various parts of the city receive in return for taxes paid, however, is not a matter of judicial inquiry in a proceeding such as this. We mention the fact that a city is not necessarily injured by having property temporarily or permanently segregated from its territorial limits because appellants seem to proceed upon the theory that an injustice would be done Mammoth City if we adopted a construction of section 775, Comp. Laws Utah 1917, which would deprive Mammoth City of the taxes for the years in question.

Public policy requires that the boundaries of cities be certain and definite at all times, not only for the purpose of administering local government, but also for the purpose of taxation. Cities are organized to spend money, not to make money. In order that a city may have the proper amount of revenue to meet the demands made upon it during any fiscal year, it is necessary that it be definitely known what property the city may tax. The embarrassment incident to a city having an insufficient revenue to meet public necessity on the one hand, and the usual extravagance incident to a city having more revenue than is necessary to meet public demand on the other hand, are both to be avoided for the public good. The lawmaking

powers of government recognize the evil that results from either extreme. Efforts have frequently been made in recent years to cure the evil by the enactment of budget laws. This court has recognized the public necessity for public revenues to be commensurate with public needs. *Juab County* v. *Bailey,* 44 Utah 377, 140 P. 764; *Rich County* v. *Bailey,* 47 Utah 378, 154 P. 773; *Mammoth City* v. *Snow,* 69 Utah 204, 253 P. 680. Our laws relating to taxation clearly contemplate that a city shall annually levy taxes commensurate with the city's need for the current year. This can be done only when the territorial limits of a city are definitely known.

A law such as appellants contend to be the law must inevitably lead to confusion if not to injustice in its application in the levy and collection of taxes on the segregated area during the interim between the entry of the district court's decree of segregation and its reversal by this court. Personal property located within a city must bear its just proportion of the burdens of taxation for municipal purposes the same as does real estate. If A owned a stock of merchandise or other personal property located upon the segregated area before the decree of segregation was reversed, how could the taxes be collected? Evidently if the property were seized for the tax and the owner resisted payment and a trial resulted, the same difficulty would be encountered in enforcing the collection of the claimed tax that would be experienced if the city should attempt to enforce its police or other regulations on the segregated area. If the tax collecting officers must await the result of an appeal before proceeding to collect a city tax upon personal property located on a segregated area, such property may well be removed or consumed before the appeal is disposed of, and thus the collection of the tax made difficult, if not impossible. Under appellants' theory of the law of this case, a purchaser of real estate within an area segregated from a city may not rely upon the public records as to whether there are tax liens against such property. He

may be confronted with a tax lien that could not be known, and indeed a lien which had only an inchoate existence at the time he made the purchase. If such be the law, it is difficult to understand why the Legislature should require the recording of a certified copy of a district court's decree together with a plat showing the segregated area in the office of the county recorder and of the secretary of state. One of the purposes of keeping the records of the county recorder is to give reliable information concerning titles to real estate. The requirement that district court's decrees of segregation must be recorded is doubtless for the purpose of informing every one of the territorial limits of the city affected by the decree. Certainly the lawmaking powers did not require the recordation of such decree for the purpose of deceiving the unsuspecting. If the recorded decree is not to be relied upon, it cannot well serve any legitimate purpose in being made a part of the public record. If decrees segregating territory from a city are not to be depended upon as genuine, it is highly improbable that the Legislature would have made provision that such decrees be made a matter of public record where all must take notice of their existence. If the Legislature had intended that a district court's decree of segregation should not take effect until the time for an appeal had expired, or, in case of appeal, until the appeal is disposed of, it would have been a very simple matter to have so provided. We thus know of no good reason why the language of section 775, Comp. Laws Utah 1917, should not be given its ordinary meaning. There are various reasons why the language of such section should be given the meaning fairly conveyed by the words used.

Our statutes provide that property shall be, by the county assessor or the state board of equalization, as the case may be, assessed at its value and to the person by whom it was owned or claimed as of 12 o'clock noon on the 1st day of January next preceding the date of assessment. The assessment of property, whether by the county

assessor or by the state board of equalization, shall be made before the first Monday in May. Comp. Laws Utah 1917, § 5876; Laws Utah 1919, chap. 114, §§ 5923 and 5929. The county assessor and state board of equalization are required to furnish a statement showing the aggregate valuation of all taxable property within the territorial limits of cities. Comp. Laws Utah 1917, § 6101; Laws Utah 1919, c. 114 § 5932. The assessment of property by the county assessor and the state board of equalization serves as a basis for a city to determine the rate of taxation. City taxes shall be levied not later than the second Monday of August of each year. Laws Utah 1921, chap. 14, p. 58. When taxes are levied they relate back to and become a lien as of 12 o'clock noon on the 1st day of January of each year. Comp. Laws Utah 1917, §§ 5995, 5996 and 5997. Respondents contend that as the property here involved was not within Mammoth City on January 1st of either of the years 1926, 1927, or 1928, such property is not liable for the payment of city taxes for those years. In support of such contention the following cases are cited: *City of Austin* v. *Butler* (Tex. Civ. App.) 40 S. W. 340; *City of Latonia* v. *Meyer* (Ky.) 86 S. W. 686; *Mayor and Aldermen of Chattanooga* v. *Raulston*, 117 Tenn. 569, 97 S. W. 456; *Harman* v. *New Marlborough*, 63 Mass. (9 Cush.) 525; *Adams* v. *Lamb Fish Lumber Co.*, 114 Miss. 534, 75 So. 378. Some of the statutes involved in the foregoing cases are quite similar to our statute. The cases support respondents' claim. Appellants have cited no cases holding to the contrary.

From what has been said it follows that when the district court of Juab county entered its decree segregating the territory in dispute from Mammoth City and a certified copy of such decree together with plats showing the territory segregated were recorded as directed by law, the segregation of the disputed area from Mammoth City became absolute and complete and remained so until the amended decree was entered by the district court. Mammoth City was without authority to levy any taxes

upon the area here sought to be taxed during any of the years 1926, 1927, and 1928.

The judgments appealed from are right and should be affirmed. Such is the order. The appellants acted in an official capacity in prosecuting this appeal, and therefore costs will not be allowed either party.

CHERRY, C. J., and FOLLAND, J., concur.

STRAUP, J. (dissenting).

An action was commenced in the district court in April, 1925, by the Plutus Mining Company and others to sever certain described territory from the corporate limits of Mammoth City in Juab county. Included within such territory sought to be severed were located mines, machinery, improvements, and personal property of the mining company. In August, 1925, on a hearing of the cause and upon findings made and a judgment rendered and entered, the district court, among other areas, severed the territory in which were located the mines and properties of the mining company. From that judgment the city prosecuted an appeal to this court, which, on May 8, 1928, reversed the judgment of the court below, directed new findings to be made, and a judgment entered denying a severance of the territory in which the mines and properties of the mining company were located. *In re Chief Consol. Mining Co. et al.* (Utah) 266 P. 1044. Such new findings and judgment in accordance with the opinion and direction of this court were made and entered June 1, 1928.

The annual net proceeds of the mines of the company for the years 1925 to 1928, the period in which the case was pending on appeal, were from $721,366 to $1,176,164. In this state mines are assessed on their annual net proceeds, and machinery, improvements, and personal property on their actual value. All of such properties of the company for such years, from 1925 to 1928, were regularly and duly assessed; but, because of the judgment rendered by the

district court severing the territory in which such properties were located, and because of writs of prohibition thereafter granted by the district court, none of the values of such properties for any of such years was apportioned to Mammoth City, and hence no city taxes collected with respect to such properties and none paid by the mining company.

The real controversy on these appeals is as to whether the properties of the mining company, notwithstanding its unsuccessful attempt to sever the territory from the corporate limits of the city and in which its properties were located, were or were not subject to city taxes during the period of such unsuccessful litigation by the mining company. It is the contention of the company, and upheld by the prevailing opinion, that from the erroneous rendition and entry of the judgment of segregation by the district court and until such erroneous judgment was reversed and new findings and a judgment entered denying a severance of such territory, the properties of the mining company situate therein were without the territorial limits of the city and free from and not subject to city taxes. I cannot concur in that.

After the appeal in the segregation cause was perfected, and while it was pending and undetermined in this court, the Plutus Mining Company and others, on August 26, 1926, in a separate and independent action against the county commissioners of Juab county, petitioned the district court for a writ of prohibition to prohibit the commissioners from apportioning to Mammoth City values of the properties assessed against the mining company within the segregated territory. In the petition for the writ, the proceedings had, and the judgment rendered by the district court in the segregation cause severing the territory from the corporate limits of the city, that an appeal had been taken from such judgment by the city to the Supreme Court, and that the appeal was pending and undetermined, were all specifically alleged. It was further alleged that on August 14, 1926 (after the

appeal was taken and perfected), the county commissioners met as a board of equalization and made and entered an order apportioning the values assessed by the state board of equalization and assessment on the properties of the mining company situated in the segregated territory, that such board had directed the commissioners to apportion the values of such assessed properties to Mammoth City, and that unless restrained, the county commissioners would do so. An alternative writ to desist and an order to show cause were issued on an ex parte application. The county commissioners appeared in the action and, on stated grounds of want of jurisdiction of the district court to issue the writ and on other grounds, moved the court to discharge the writ and to dismiss the action. The motion was denied November 6, 1926, and the writ made permanent. After the judgment of the court below in the segregation cause on the appeal was reversed on May 8, 1928, and after new findings on June 1, 1928, had been made and another judgment entered in accordance with the directions and opinion of the Supreme Court denying a severance of the territory in which the properties of the mining comany were located, the commissioners on June 16, 1928, by written motion filed in the cause in which the writ of prohibition was granted, again moved the court to revoke and annul the writ theretofore granted. The motion was denied November 17, 1928.

After the judgment of the court below in the segregation cause was reversed and after remittitur, new findings made, and a judgment entered on June 1, 1928, in accordance with the directions of this court denying a severance of the territory in which the properties of the mining company were located, the Plutus Mining Company, on June 15, 1928, by a separate action against the county commissioners, again petitioned the district court for another writ of prohibition to prohibit the county commissioners from making an apportionment of values for the years from 1925 to 1928, the time in which the appeal in the segregation cause was pending, of any of its assessed properties situated in the

territory sought to be, but which was not severed, and from collecting any city taxes on such properties for such period. In that petition all of the proceedings had in the segregation cause were again alleged, that an appeal had been taken to the Supreme Court from the judgment of the court below, a reversal of the judgment had, and that new findings had been made and filed and another judgment entered in accordance with the opinion and directions of the Supreme Court denying a severance of the territory in question. It, however, in that petition, was further alleged "that notwithstanding said appeal and said reversal, the decree (in the court below) in said cause was, until vacated and reversed and during the time from August 15, 1925 (when the decree in the court below was rendered) and the 1st day of June, 1928 (when the new findings and judgment thereon were entered in accordance with the opinion and direction of the supreme court), in full force and effect and during all of such time the lands described in said decree of August 15, 1925, including the lands of your petitioner, lay outside the limits of Mammoth City"; and that unless restrained, the county commissioners would, as directed by the state board of equalization, apportion the assessed value of the properties of the mining company situate in the territory in question and proceed to collect the unpaid city taxes thereon. On an ex parte application an alternative writ to desist and an order to show cause were again granted. The commissioners again appeared in that action and demurred to the petition upon grounds that the court was without jurisdiction to issue the writ and that the petition did not state facts sufficient to entitle the petitioner to the demanded relief. The matter was taken under advisement until November 17, 1928, when the demurrer was overruled and the writ made permanent.

Two separate appeals are prosecuted by the commissioners, one in each case in which the writ was granted and made permanent. It is apparent that the real controversy involves the question of whether the mining company, dur-

ing the period of litigation from 1925 to 1928 in which it sought but failed to sever the territory from the corporate limits of the city, is, because of such litigation, relieved from paying city taxes which it has not paid on its assessed properties in such territory so sought to be severed by it but which by the final adjudication of this court was not permitted to be severed. It is the contention of the appellants herein, the commissioners, that the granting of the writ in each case was in excess of subject-matter jurisdiction; and further, though it be held the district court had jurisdiction, still the granting of the writs constituted reversible error and the rulings with respect thereto reviewable on direct attacks by the appeals herein taken. In the prevailing opinion the thought seems to be entertained, and a ruling in effect made, that since by the Constitution district courts are made courts of general jurisdiction and given power to issue writs of prohibition, the court below had jurisdiction of subject-matter, and hence the rulings granting the writs involved questions of mere error. I do not concur in that. Because district courts are courts of general jurisdiction and given power to grant writs of prohibition, it does not follow that the court below had subject-matter jurisdiction of the cause. A court, of course, must have cognizance of the class of cases to which the one adjudicated belongs, which, usually, is conferred either by constitutional or statutory provisions; but it also must have jurisdiction of the subject-matter of a concrete case which is conferred and acquired by pleadings. That is, jurisdiction of subject-matter of a controversy of a cause and the authority of the court to hear and determine it, in the first instance, is dependent upon allegations of the complaint or petition or other initiatory pleading. In other words, it is the pleadings which constitute the juridical means of investing a court with jurisdiction of subject-matter of a cause to hear and determine it. We have frequently held that. *Stockyards Natl. Bank, etc.*, v. *Bragg*, 67 Utah 60, 245 P. 966; *Oldroyd* v. *McCrea*, 65 Utah 142, 235 P. 580, 40 A. L. R.

230; *In re Evans,* 42 Utah 282, 130 P. 217; *State* v. *Topham,* 41 Utah 39, 123 P. 888. Such, too, is the general holding of other courts. *Dippold* v. *Cathlamet Timber Co.,* 98 Or. 183, 193 P. 909; *Hope* v. *Blair,* 105 Mo. 85, 16 S. W. 595, 24 Am. St. Rep. 366; *State ex rel.* v. *Muench,* 217 Mo. 124, 117 S. W. 25, 129 Am. St. Rep. 536; *Cooper* v. *Reynolds,* 10 Wall. 316, 19 L. Ed. 931; *Munday* v. *Vail,* 34 N. J. Law 418.

For such reason have I referred to the substance of the petitions in the court below and upon which the writs were granted. As is seen, the gist of the petition for the first writ is that since the district court by its decree in the segregation cause severed the territory in which the properties of the mining company are located from the corporate limits of the city, and though an appeal was taken by the city to the Supreme Court to reverse the judgment in such particular, nevertheless, until the judgment was reversed it was in full force and effect, and as was alleged in the petition for the writ, the judgment being "self-executing," the company was entitled to have it enforced and carried into execution and the properties of the mining company regarded as being without the corporate limits of the city pending the appeal, regardless of whether the judgment of the court below was reversed or affirmed.

And as is seen, the gist of the petition for the second writ, which was issued after the original judgment in the segregation cause was reversed and findings made and another judgment entered in accordance with the opinion and direction of the Supreme Court denying a severance as to the territory in question, is that notwithstanding the appeal and the decision of this court reversing the judgment of the court below and directing new findings and the entry of a different judgment, the original decree of the district court from August 15, 1925, when it was rendered and entered, and until June 1, 1928, when the judgment as directed by this court was entered, was in full force and effect and the lands and properties of the company outside

the limits of the city, and hence were not subject to city taxes for any part of such period.

The petitions, not being founded on any admitted or issuable facts, but solely upon groundless and unwarranted conclusions of law respecting the legal effect of the decree of the district court in the segregation cause pending the appeal, I am of the opinion that no authority was conferred on the district court to grant either of the writs, and especially not the second writ.

However, inasmuch as the appeals before us are direct attacks on the proceedings and rulings of the district court granting the writs, the judgments of the court below nevertheless must be reversed, though it be deemed the district court had jurisdiction, if the writs were erroneously granted. Hence, what I shall further say may be regarded as applying to both propositions. Since the appeals here, being direct attacks on the judgments of the court below granting the writs, if the asserted legal effect of the decree of the district court in the segregation cause pending the appeal was groundless and unwarranted, then fall the petitions, and then must the judgments founded thereon also fall. Thus, the crucial question is: What, pending the appeal, was the legal effect of the erroneous decree of the district court in the segregation cause severing the territory in question from the corporate limits of the city? The mining company asserts, and in the prevailing opinion it in effect is held, that the decree, nothwithstanding the appeal and its pendency, was "self-executing" and enforceable, until the decree was reversed, and that until then, the decree fixed and determined the rights of the parties to the same extent as though the decree had been affirmed. Such claims are made on the doctrine that a judgment rendered by a court of competent jurisdiction, having jurisdiction of subject-matter and of the parties, is binding on them until it is reversed or modified. I think the doctrine misconceived and misapplied to the matter in hand. It generally is applied to collateral attacks on judgments. These appeals are direct

attacks. But that does not answer what the effect of a judgment is when an appeal is taken therefrom and a supersedeas given. In determining that, the character of the cause in which the appeal is taken, whether it is a suit in equity or an action at law, is an important factor. We many times have held that on an appeal in an equity case on questions of both law and fact the review in this court is in effect a trial de novo on the record. If the segregation cause was a suit in equity and not merely an action at law, then the appeal which was on questions of both law and fact involved in effect a trial de novo on the record, in which case, the appeal, when perfected and the whole case transmitted to this court, in legal contemplation, vacated or rendered inoperative the judgment of the court below. In such respect the effect of an appeal is different from a mere appeal in an action at law to review errors. In an equity case, the appeal when perfected opens the whole case and renews the litigation before the appellate tribunal. When the case reaches that tribunal upon the whole case transmitted to it, the judgment of the court below in legal effect is vacated, for the appeal operates as an immediate transfer of the case to the appellate court, puts an end to any further control of the inferior court, operates to annul its judgment which in legal contemplation ceases to exist, and leaves the case with all its incidents precisely as it stood before the rendition of the judgment in the court below. On such a review, the appellate tribunal in reviewing the record makes or directs findings and a judgment, regardless of what findings were made or what judgment was rendered in the court below. Such views are amply supported by the authorities. *Snelling* v. *Parker,* 8 Ga. 121; *Smith* v. *Holmes,* 59 Tenn. (12 Heisk.) 466; *Fort* v. *Fort,* 118 Tenn. 106, 101 S. W. 433, 11 Ann. Cas. 964; *Lewis, Adm'r,* v. *St. Louis & I. M. R. R. Co.,* 59 Mo. 495, 21 Am. Rep. 385; *Bank of North America* v. *Wheeler,* 28 Conn. 433, 73 Am. Dec. 683; *Klicka* v. *Klicka,* 105 Ill. App. 369; *Anderson* v. *Patty,* 168 Ill. App. 151; *Rogers* v. *Hatch,* 8 Nev. 35; 2 R. C. L. 118; 3 C. J. 1261.

If on such a review the appellate court affirms or modifies the judgment of the court below, the affirmance or modification relates back to the rendition and entry of the judgment in the court below. If it is reversed, the judgment of the court below is rendered ineffectual for any and all purposes, and the judgment rendered or directed by the appellate tribunal becomes the final judgment in the cause and the final determination of the rights of the parties in and to the subject-matter of the litigation, and relates back to the time when the judgment of the court below was rendered and entered.

In some jurisdictions a proceeding for a severance of territory from a city or town is regarded as an action at law. *Lorimor* v. *Incorporated Town of Lorimor*, 196 Iowa 774, 195 N. W. 199; *Heebner* v. *Orange City*, 44 Fla. 159, 32 So. 879. But in the Iowa case the statute expressly provided that the hearing "may be had by the court, or either party may demand a jury." In the Florida case the opinion does not disclose whether on a demand for a jury the issues may or may not be tried by a jury. An examination, however, of the statute referred to in the opinion shows that it provides that a petition for severance may be heard and determined by the court in term time or vacation and any question of fact "may be" determined by the court without a jury. Our statute (Comp. Laws Utah 1917, § 771) provides that the "issue shall be joined and the cause tried as provided for the trial of civil causes, as nearly as may be." A suit in equity is a "civil case" as much as is an action at law. The statute, section 772, further provides that "if the court finds * * * that the allegations of the petition are true, and that justice and equity require that such territory or any part thereof should be disconnected from such city, it shall appoint three disinterested persons as commissioners to adjust the terms upon which such part shall be so severed," etc., who shall make a report to the court who may approve it or for good cause shown modify or reject it.

It is not always easy to determine whether a given cause is one in equity or at law. The principal determining factors are the pleadings, the primary purpose of the action, the relief sought, whether a disposition of the issues involves the application of mere legal or equitable priciples, and as to whether the issues may or may not be tried and determined by a jury. Because a proceeding is statutory does not necessarily determine whether the case is in equity or law. *Duncan* v. *Greenwalt* (C. C.), 10 F. 800. Whatever divergent views may be entertained as to whether the case here for severance was one in equity or at law, from the manner in which it was considered and reviewed by this court on the appeal, in effect a trial de novo on the record, directing the lower court, not to further try or hear the case, but to make findings and enter judgment in accordance with the views expressed in the opinion of this court (*In re Chief Consolidated Min. Co. et al.*, 266 P. 1044), it seems quite clear that the case was by this court considered and heard as one in equity. It was only on such theory that this court was authorized to give the directions as was done with respect to the making of findings and the entry of a judgment in accordance with its opinion. In other words, this court on merits made a complete and final determination of all the claims and rights of the parties to the cause. Had the case been regarded as one at law, this court determining that the findings were not supported by sufficient competent evidence, or that other errors of law prejudicial to the rights of the appellant had been committed, the only ruling that could properly have been made would have been a reversal of the judgment and a remanding of the case for a new trial or for further hearing. In such case this court would not have been authorized to dismiss the action, or to make or direct findings or a judgment, unless the action was not in any event maintainable and the plaintiffs in no event entitled to any relief.

But how stands the case if the segregation cause be regarded merely as an action at law? And what was the legal

effect of the appeal in such case? On an appeal requiring merely a review of errors and an affirmance of a judgment or a reversal and a remanding for further trial or hearing, the judgment of the lower court is not vacated, but its operation and force and effect may be and is suspended or stayed pending the appeal by a supersedeas. By Comp. Laws Utah 1917, § 7225, it is provided that when the state or a city or county, or any of its officers, is a party plaintiff or defendant, no undertaking, supersedeas, or security can be required, but that each has the same rights, remedies, and benefits as though an undertaking or supersedeas had in fact been given. Mammoth City thus on its appeal had all the rights, remedies, and benefits of a supersedeas as prescribed by the statute (section 7005), which, among other things, provides that whenever an appeal is perfected "it stays all further proceedings in the court below, upon the judgment or order appealed from, or upon the matter embraced therein"; and it is the general rule that when an appeal is perfected the case becomes one for cognizance of the appellate court and for that court alone, the authority of the lower court terminated, and that it cannot proceed as to any matter involved in the subject-matter of the appeal, until the appeal is heard and determined, and that it cannot take any action which in effect will be an execution or an enforcement of the judgment, or which will affect the subject-matter of the appeal, or which is in pursuance or affirmance of the judgment or embraced in the appeal. 3 C. J. 1255, 1263, 1319; 2 Cal. Jur. 422. In the case of *State ex rel. Kay* v. *Draney,* 57 Utah 14, 176 P. 767, this court had under consideration the effect of an appeal and of a supersedeas. Therein it approvingly quoted this language from the Supreme Court of California in the case of *Mark* v. *Superior Court,* 129 Cal. 1, 61 P. 436, 438:

"The effect of the appeal from the judgment was to leave the parties in the same situation, with reference to the rights involved in the action, as they were *prior to the rendition of the judgment.*" (Italics added.)

To the same effect are *Mulvey* v. *Superior Court*, 22 Cal. App. 514, 135 P. 53; *Watkins* v. *Dunbar*, 318 Ill. 174, 149 N. E. 14, 15; *Midland Terminal Ry. Co.* v. *Warinner* (C. C. A.) 294 F. 185; *Phebus* v. *Search* (C. C. A.) 264 F. 407; *Indiana Elec. Sup. Co.* v. *Lux*, 77 Ind. App. 286, 130 N. E. 153.

In *Watkins* v. *Dunbar*, supra, the court said:

"When the appeal from the judgment in the replevin case was perfected in the Appellate Court, the circuit court of Christian county lost jurisdiction of the case and all proceedings in that court were stayed. * * * There being no case pending in the circuit court, that court had no authority to enter any order in the cause until it was properly reinstated."

In view of all this, I think that when the district court granted the first writ of prohibition after the appeal had been taken and perfected in the segregation cause and the case transferred to the Supreme Court, the district court exceeded its authority and jurisdiction. That the granting of the writ was something done in pursuance and in affirmance of the judgment appealed from, if not in execution and enforcement of it, and constituted action taken as to the very matter embraced and included in the appeal, cannot well be doubted. Strange it is that it should be thought that the court by a separate and independent action had authority to do something which it could not do in the action itself from which the appeal was taken. And since the court could not, under the statute, exact any bond or security from the city, it could not indirectly accomplish the same purpose or effect by issuing a writ of prohibition, nor, much less, could it treat the judgment as in force and as operative, and permit it to be asserted in or made the basis of a separate and independent action against those, the county commissioners, not parties to the cause in which the judgment of segregation was rendered.

But further as to this. We have another statute (Comp. Laws Utah 1917, § 7220) which provides that "an action is

deemed to be pending from the time of its commencement until its final determination upon appeal, or until the time for appeal has passed, unless the judgment is sooner satisfied." With respect to such a statutory provision it, in 2 Cal. Jur. 412, is said:

"The code expressly declares that an action is deemed pending while an appeal from the judgment is pending. Although a judgment may be final with reference to the trial court which rendered it, and, as such, be the subject of an appeal, yet it is not a final determination of the rights of the parties pending its review upon appeal. A judgment, in order to be admissible in evidence for the purpose of proving facts therein recited, must be a final judgment in a cause. Hence, it has been repeatedly held that the operation of a final judgment is suspended by an appeal therefrom, or that pending such appeal the judgment is not admissible in another case as evidence, even between the same parties."

And on page 137 of the same volume the author further says that a judgment in one sense may be final with reference to the property or rights affected so that no further proceedings in a cause by appeal or otherwise may be taken, but in another sense a judgment may be final as to the court which renders it without being final as to the subject-matter, and, as such, be the subject of an appeal, without being final with reference to the property or rights affected.

Many California cases are cited in support of the texts. Our statute is the same as that of California. I find it necessary to quote from only one of the cited cases, *Gillmore* v. *American C. I. Co.*, 65 Cal. 63, 2 P. 882, 884. It is there said:

"While proceedings are pending for the review of a judgment, either on appeal or motion for a new trial, the litigation on the merits of the case between the parties is not ended; and until litigation on the merits is ended there is no finality to the judgment in the sense of a final determination of the rights of the parties, although it may have become final for the purpose of an appeal from it."

Because the operation of a judgment is suspended and unenforceable by an appeal therefrom, this court, in line with

many other courts, held that pending an appeal and until it is determined the judgment is not admissible in another case. *Vance* v. *Heath*, 42 Utah 148, 129 P. 365. For stronger reasons does it follow that a judgment pending an appeal cannot be made the basis upon which to found another action, as was done by the court below when in a separate action the first writ of prohibition was granted. The appeal, as stated by the court in the case of *Barnhart* v. *Edwards*, 128 Cal. 572, 61 P. 176, 178, "deprived the judgment of all effect as the basis of any action of the court dependent thereon." That the action of the court granting the writs was based on the decree rendered by the district court in the segregation cause and as operative and enforceable pending the appeal and notwithstanding its reversal cannot be doubted.

Since, therefore, there was no final determination of the rights of the parties in the segregation cause until the decision of this court on the appeal and the entry of findings and another judgment in accordance therewith, it necessarily follows that when such determination was made, the original judgment of the district court was for all purposes rendered of no more binding or legal effect than though it never had been rendered or entered. Having been vacated and deprived of all legal effect, I see no support for the claim that the judgment thereafter could become the basis for another action, or for any kind of proceeding founded upon it as was done when the second writ was granted. The court in the causes for the writs was not required to take, though it be assumed it could have taken, judicial notice of the reversal of the judgment in the segregation cause and the entry of another judgment in lieu thereof .denying severance, for all such matters were fully averred in the petition for the writ.

When it thus is considered that because of the appeal in the segregation cause the rights of the parties to the subject-matter of the litigation were not finally determined until the cause on the appeal was disposed of, and that when

the judgment of the court below granting the serverance was reversed and another judgment in lieu thereof directed and entered denying a severance, which, as the authorities say, related back to the time when the judgment of the court below was rendered and entered, it seems quite apparent to me that the territory in question was not severed, but remained where it was when the litigation started, within the corporate limits of the city, and that the basis of the assumed contingencies referred to in the prevailing opinion disappears. In other words, not anything with respect to a severance was accomplished by the litigation, except an adjudication that the mining company was not entitled to a severance of the territory in which its properties were located. Its properties thus were within the corporate limits of the city when the litigation started and still were in when the litigation ended and the rights of the parties with respect thereto finally determined.

To support the claim that its properties during the years in question were out, and the taxing authorities prevented from collecting city taxes thereon, which admittedly remain unpaid, it is apparent that the company is required to rely, as it does, on a decree, which because of the appeal was not a final determination of the rights of the parties to the cause, and which on the appeal was held for naught and vacated. It is difficult to perceive a more groundless basis to support any kind of a claim or demand.

I therefore am of the opinion that the district court was without jurisdiction to grant either writ. I further am of the opinion that though it be considered the district court had jurisdiction, the granting of the writs nevertheless was erroneous and unjustifiable, and in either view the judgment granting the writs should be reversed and vacated, and the taxing authorities permitted to collect the unpaid taxes on the properties of the mining company which on the final adjudication of the segregation cause were adjudged to be at all times in question within and not without the terri-

torial limits of the city and hence subject to taxation for city purposes.

EPHRAIM HANSON, J.

I concur in the views expressed by Mr. Justice STRAUP in his dissenting opinion.